24 P.3d 661

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Jose Luis VALDIVIA, Defendant–Appellant.**

No. 23556.

Supreme Court of Hawai'i.

June 7, 2001.

Jon N. Ikenaga (Deputy Public Defender), on the briefs, for the defendant-appellant, Jose Luis Valdivia.

Caroline M. Mee (Deputy Prosecuting Attorney), on the briefs, for the plaintiff-appellee, State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, RAMIL, and ACOBA, JJ.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Jose Luis Valdivia appeals from the judgment of the first circuit court, the Honorable Virginia Lee Crandall presiding, convicting him of and sentencing him for the offenses, *inter alia*, of kidnapping, in violation of Hawai'i Revised Statutes (HRS) § 707–720(1)(d) (1993),[1] and terroristic threatening in the first degree, in violation of HRS § 707–716(1)(c) (1993).[2] On appeal, Valdivia asserts that (1) the evidence adduced by the prosecution was insufficient to support his convictions of the offenses of kidnapping and first degree terroristic threatening,. (2) the circuit court incorrectly instructed the jury regarding the definition of "threat," and (3) he was deprived of a fair trial due to prosecutorial misconduct, which was, Valdivia posits, so egregious that reprosecution should be barred.[3]

---

1. HRS § 707–720(1)(d) provides in relevant part that "[a] person commits the offense of kidnapping if the person intentionally or knowingly restrains another person with intent to ... [i]nflict bodily injury upon that person[.]" Pursuant to HRS § 707–700 (1993), "[r]estrain," *inter alia*, "means to restrict a person's movement in such a manner as to interfere substantially with the person's liberty ... [b]y means of force[.]" " 'Bodily injury' means physical pain, illness, or any impairment of physical condition." *Id.*

2. HRS § 707–716(1)(c) provides in relevant part that "[a] person commits the offense of terroris-

tic threatening in the first degree if the person commits terroristic threatening ... [a]gainst a public servant[.]" HRS § 707–715 (1993) defines "terroristic threatening" as follows: "A person commits the offense of terroristic threatening if the person threatens, by word or conduct, to cause bodily injury to another person ... [w]ith the intent to terrorize, or in reckless disregard of the risk of terrorizing, another person[.]"

3. In addition to the two convictions he specifically challenges on appeal, Valdivia was convicted of and sentenced for the offenses of terroristic threatening in the second degree, in violation of

Specifically, Valdivia urges reversal of his conviction of the offense of kidnapping because the prosecution allegedly adduced insufficient evidence regarding his intent to restrain, as well as his intent to inflict bodily injury upon, Honolulu Police Department (HPD) Officer Brad Heatherly. Valdivia urges reversal of his conviction of first degree terroristic threatening because the prosecution allegedly adduced insufficient evidence that the statement he directed at HPD Officer Shannon Kawelo was a "true threat," insofar as it lacked any "imminent prospect of execution." Alternatively, Valdivia asserts that this court should vacate and remand his conviction of first degree terroristic threatening because the circuit court erroneously instructed the jury in two respects: (1) the court did not instruct the jury that a "true threat" must be uttered under circumstances that convey an "imminent prospect of [its] execution"; and (2) the court did not instruct the jury that it could consider, "[w]here a threat is directed at a police officer, . . . that police officers are trained to a professional standard of behavior that ordinary citizens might not be expected to equal." Lastly, Valdivia argues that he was denied a fair trial due to the deputy prosecuting attorney's (DPA's) misconduct during his opening statement, as well as during his closing and rebuttal arguments. Valdivia posits that the DPA's misconduct was so egregious that principles of double jeopardy[4] bar reprosecution of all the offenses of which he was convicted, see State v. Rogan, 91 Hawai'i 405, 984 P.2d 1231 (1999).

We hold that the prosecution adduced sufficient evidence to sustain Valdivia's convictions of the offenses of kidnapping and first degree terroristic threatening and that any

misconduct in which the DPA engaged was harmless beyond a reasonable doubt. We further hold, however, that the circuit court insufficiently instructed the jury with respect to the offense of terroristic threatening and that the error was not harmless beyond a reasonable doubt. Accordingly, we vacate Valdivia's conviction of the offense of first degree terroristic threatening and remand for a new trial as to that offense. In all other respects, we affirm the circuit court's judgment of conviction and sentence in this matter.

## I. BACKGROUND

Valdivia was charged by complaint with committing numerous offenses arising out of several incidents that occurred on November 3, 1999 as he drove down Ala Moana Boulevard and around Waikīkī. We limit our discussion of the background facts to those relevant to the convictions Valdivia specifically challenges on appeal. Further facts germane to Valdivia's claims regarding the circuit court's jury instructions and prosecutorial misconduct are discussed *infra* in sections III.B and III.C, respectively.

In count 2 of the complaint, Valdivia was charged with the offense of kidnapping Officer Heatherly with the intent to inflict bodily injury upon him, in violation of HRS § 707 720(1)(d), see supra note 1. On November 3, 1999, Officer Heatherly was assigned to the Waikīkī police "substation" and, while monitoring police radio communications, heard a description of Valdivia's vehicle, which was reported as possibly involved in an accident and fleeing from another police officer. Subsequently, a construction worker who had

HRS § 707–717(1) (1993), assault against a police officer, in violation of HRS § 707–712.5(1)(a) (1993), reckless driving, in violation of HRS § 291–2 (1993 & Supp.2000), and two counts of resisting an order to stop a motor vehicle, in violation of HRS § 710–1027 (1993). During closing arguments, Valdivia conceded guilt as to the offenses of second degree terroristic threatening, reckless driving, and resisting an order to stop a motor vehicle. To the extent that prosecutorial misconduct tainted Valdivia's right to a fair trial, *see infra* section III.C, his concessions of guilt as to the foregoing offenses render the taint harmless beyond a reasonable doubt as to them. Accordingly, Valdivia's prosecutorial

misconduct claim implicates only his convictions of and sentences for the offenses of kidnapping, first degree terroristic threatening, and assault against a police officer.

4. The fifth amendment to the United States Constitution provides in relevant part that "[n]o person . . . shall . . . be subject for the same offense to be twice put in jeopardy of life or limb[.]" Article I, section 10 of the Hawai'i Constitution (1982) similarly provides in relevant part that "[n]o person . . . shall . . . be subject for the same offense to be twice put in jeopardy[.]"

been working on Kalākaua Avenue came into the substation and reported that two vehicles outside the substation had possibly been involved in an accident and that the two drivers appeared to be arguing with each other. Officer Heatherly exited the substation and observed Valdivia's vehicle, which matched the description earlier broadcast over the police radio. Valdivia was sitting atop the hood of his vehicle.

Officer Heatherly testified that the driver's-side door of Valdivia's vehicle was open. Officer Heatherly approached Valdivia from the rear of Valdivia's vehicle and instructed Valdivia to remain where he was. Valdivia, rather than heeding the officer's direction, jumped off the hood and dashed towards the open door, which he reached before Officer Heatherly did. The two struggled with each other; Officer Heatherly testified that Valdivia struck him twice with a closed fist before he could return a blow to Valdivia's face. The scuffle continued as Valdivia attempted to enter his vehicle. While gaining the driver's seat of the vehicle, Valdivia was able to "grab" and "hold" Officer Heatherly's left arm. With his right hand, however, Officer Heatherly managed to spray Valdivia with half to three-quarters of a cannister of "pepper spray," which he testified had no effect upon Valdivia.

Officer Heatherly testified that the struggle continued after Valdivia gained the driver's seat of the vehicle and that Valdivia continued to "hold" his arm, despite his attempts to extricate it. Officer Heatherly explained that Valdivia had his arm "pinned" against the steering wheel and that he was trying to pull his arm away, "trying to get [it] free." Officer Heatherly, after spraying Valdivia with the pepper spray, observed that Valdivia was pulling an object, which he believed at the time might be a knife, from beneath the driver's seat. With his right hand, Officer Heatherly drew his firearm. At that point, Valdivia "immediately threw [the vehicle] into drive." Officer Heatherly testified that he "felt the car immediately start taking off" and that he "was frantically trying to get [his left] arm" free. Because he could not free his arm, Officer Heatherly grabbed the frame of the vehicle with three

fingers of his right hand while still holding onto his firearm.

Officer Heatherly was dragged approximately thirty yards down Kalākaua Avenue. He testified that, while being dragged, he "was constantly yanking [his pinned arm] away." Eventually, his arm became free, and he rolled away from Valdivia's moving vehicle. Officer Heatherly testified that he did not know "if [he] was able to break free" or "if [he] was too heavy [and Valdivia] let go."

Several other witnesses, including the only witness called by Valdivia at trial, confirmed, albeit with some inconsistency, the general contours of Officer Heatherly's testimony, but none actually observed whether Valdivia was or was not holding or pinning Officer Heatherly's arm while the vehicle was moving and the officer was dragged down the street.

Count 3 of the complaint charged Valdivia with first degree terroristic threatening by threatening to cause bodily injury to Officer Kawelo in reckless disregard of the risk of terrorizing the officer, in violation of HRS § 707–716(1)(c), see supra note 2. In this connection, two police officers gave chase to Valdivia after Officer Heatherly was dragged down Kalākaua Avenue. The chase ended when Valdivia collided with a green vehicle on Sunset Avenue. After the collision, Valdivia exited his vehicle; it took four police officers to subdue and handcuff Valdivia due to his resistance to being apprehended. While the officers were engaged in physically overcoming Valdivia's resistance, Valdivia asserted several times that he was "going to fucking kill" the officers; he was not, however, charged in the present matter with any offense in connection with these utterances.

Officer Kawelo was one of the officers who assisted in arresting and handcuffing Valdivia. Officer Kawelo also transported Valdivia to a hospital because Officer Heatherly (as well as another officer during the arrest) had sprayed him with pepper spray. Officer Kawelo testified that, while on the way to the hospital and, forming the basis of the charge in count 3, once when in the hospital, Valdivia threatened to "kill" him.

On the drive to the hospital, Valdivia was handcuffed and was further restrained by means of a bar—which Officer Kawelo explained acted as a "seat belt" and prevented Valdivia from "mov[ing] too much"—that the officer had placed over Valdivia because he had been difficult to subdue during the arrest. In the course of the drive, Valdivia, according to Officer Kawelo, said, "I'm gonna kill you, fucker," "I'm gonna kill you," and "You're dead, Officer." Officer Kawelo testified that Valdivia's threats were interspersed with thirty-second to two-minute pauses but that Valdivia kept "threatening [him] all the way down to Queens Medical Center." However, because Officer Kawelo "thought [he] had [Valdivia] restrained," Valdivia's threats on the way to the hospital did not "worr[y]" him. The prosecution did not charge Valdivia with any offense arising from these "threats" in the present matter.

Valdivia's alleged threat to Officer Kawelo once they were at the hospital, on the other hand, did "worr[y]" the officer. HPD Officer Samantha Kailihou had followed Officer Kawelo to the hospital. Together, the two officers escorted Valdivia inside and stood on either side of him while he sat and awaited treatment. According to Officer Kawelo, Valdivia turned to him and, while still handcuffed, said, "I'm gonna kill you and your police uniform." Officer Kailihou testified that Valdivia was yelling and screaming at, but not physically struggling with, the officers when they took him from Officer Kawelo's vehicle into the hospital. Officer Kailihou substantiated Officer Kawelo's testimony that, while seated and handcuffed with his hands behind his back, Valdivia looked at Officer Kawelo and stated he was "gonna kill [him]," as well as "kill [his] police uniform."

Valdivia did not testify. Because Valdivia's only witness had been called out of order, the prosecution and the defense rested their cases simultaneously and Valdivia moved for judgments of acquittal with respect to counts 2 and 3. The circuit court denied the motions. The jury convicted Valdivia, *inter alia*, of kidnapping as charged in count 2 and terroristic threatening in the first degree as charged in count 3.

## II. STANDARDS OF REVIEW

### A. Sufficiency Of The Evidence

[E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Young*, 93 Hawai'i 224, 230, 999 P.2d 230, 237 (2000) (citations omitted) (brackets in original). "Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *State v. Jenkins*, 93 Hawai'i 87, 99, 997 P.2d 13, 25 (2000) (citations and internal quotation signals omitted). "Under such a review, we give full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Id.* (citations and internal quotation signals omitted).

### B. Jury Instructions

When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading....

[E]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

[E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that the error may have contributed to conviction....

. . . . If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside. . . .

State v. Valentine, 93 Hawai'i 199, 204, 998 P.2d 479, 484 (2000) (citations and internal quotation signals omitted) (brackets in original).

### C. Prosecutorial Misconduct

Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of "whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Balisbisana, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996) (quoting State v. Holbron, 80 Hawai'i 27, 32, 904 P.2d 912, 917, reconsideration denied, 80 Hawai'i 187, 907 P.2d 773 (1995) (citations and internal quotation marks omitted)); see also State v. Sanchez, 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App.), cert. denied, 84 Hawai'i 127, 930 P.2d 1015 (1996) (citations omitted). Factors to consider are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. State v. Samuel, 74 Haw. 141, 148, 838 P.2d 1374, 1378 (1992) (citation omitted).

Rogan, 91 Hawai'i at 412, 984 P.2d at 1238 (quoting State v. Sawyer, 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998)). Moreover, under the double jeopardy clause of the Hawai'i Constitution, see supra note 4, "reprosecution is barred where, in the face of egregious prosecutorial misconduct, it cannot be said beyond a reasonable doubt that the defendant received a fair trial." Rogan, 91 Hawai'i at 423 & n. 11, 984 P.2d at 1249 & n. 11.

### D. Statutory Interpretation

"[T]he interpretation of a statute . . . is a question of law reviewable de novo." State v. Rauch, 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000) (citations omitted) (brackets in original). However, "statutory construction is

guided by established rules[.]" Id. (citations omitted).

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists. . . .

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) [(1993)]. Moreover, the courts may resort to extrinsic aids in determining legislative intent. One avenue is the use of legislative history as an interpretive tool.

. . . . This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993). "Laws in pari materia, or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

Rauch, 94 Hawai'i at 322–23, 13 P.3d at 331–32 (some citations omitted) (brackets in original) (some ellipses points added and some in original).

## III. DISCUSSION

### A. Sufficiency Of The Evidence

Valdivia urges that the prosecution adduced insufficient evidence to support his convictions in connection with count 2, which charged that he kidnapped Officer Heatherly with the intent to inflict bodily injury upon the officer, in violation of HRS § 707–720(1)(d), see supra note 1, and count 3, which charged that he committed first degree terroristic threatening against Officer

Kawelo, in violation of HRS § 707–716(1)(c), *see supra* note 2.

### 1. *Count 2: Kidnapping*

To convict Valdivia of the offense of kidnapping, pursuant to HRS § 707–720(1)(d), *see supra* note 1, the prosecution was required to prove beyond a reasonable doubt that Valdivia intentionally or knowingly restrained Officer Heatherly with the intent to inflict bodily injury upon him. *See* HRS §§ 701–114 (1993) (requiring proof beyond a reasonable doubt of each element of an offense and the state of mind requisite to each element) and 702–205 (1993) (providing, *inter alia,* that the elements of an offense are the conduct, attendant circumstances, and results of conduct specified by the definition of the offense). Valdivia argues that the prosecution's evidence was insufficient to justify a reasonable person in the conclusions (1) that he intentionally or knowingly restrained Officer Heatherly and (2) that he did so intending to inflict bodily injury upon Officer Heatherly.

a. *The prosecution adduced substantial evidence from which a person of reasonable caution could conclude that Valdivia intentionally or knowingly restrained Officer Heatherly.*

■ With respect to Valdivia's first claim, we note that the prosecution, at a minimum, was required to prove beyond a reasonable doubt that Valdivia was aware that his conduct—to wit, "pinning" Officer Heatherly's left arm to the steering wheel of Valdivia's vehicle—was of such a nature as forcibly to restrict the officer's movement ·in such a manner as to interfere with his liberty. *See* HRS §§ 702–206(2)(a) (1993) (defining "knowing" state of mind with regard to conduct) and 707–700 (defining restraint) *supra* note 1. Because of "the difficulty of proving the requisite state of mind by direct evidence in criminal cases," this court has "consistently held that ... proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the [defendant's conduct] is sufficient" to justify a person of reasonable caution in drawing a conclusion regarding a defendant's state of mind. *Jen-*

*kins,* 93 Hawai'i at 106, 997 P.2d at 32 (brackets in original) (citations and internal quotation signals omitted). Accordingly, "the mind of an alleged offender may be read from his acts, conduct[,] and inferences fairly drawn from all the circumstances." *Id.* (citations omitted).

Officer Heatherly testified that Valdivia had "pinned" the officer's left arm against the steering wheel of his car when Valdivia engaged the car and "dragged" the officer down the street for approximately thirty yards. Officer Heatherly further testified that he was unable to free his arm from being pinned, despite his concerted efforts to do so. Although other witnesses could not confirm whether Valdivia was or was not holding or pinning the officer's arm while driving down the street, the fact remains that no evidence was adduced contradicting Officer Heatherly's testimony on this point. Officer Heatherly's testimony, if found credible by the jury, was sufficient to justify a person of reasonable caution in drawing the conclusion that Valdivia, at the very least, was aware that he had Officer Heatherly's arm "pinned" and, thereby, was forcibly restricting the officer's movement (that is, preventing him from freeing his arm) such that it interfered with the officer's liberty. Accordingly, the prosecution adduced substantial evidence regarding Valdivia's state of mind with regard to his conduct.

b. *The prosecution adduced substantial evidence from which a person of reasonable caution could conclude that Valdivia intended to inflict bodily injury upon Officer Heatherly.*

■ Turning to Valdivia's claim that the prosecution adduced insufficient evidence regarding his intent to inflict bodily injury to Officer Heatherly, we note that the prosecution was required to establish beyond a reasonable doubt that, at the time he intentionally or knowingly restrained Officer Heatherly, Valdivia's conscious object for doing so was to inflict ·bodily injury upon the officer, either by the means employed to restrain the officer or by some other conduct. *See* HRS §§ 707–720(1)(d), *supra* note 1, 701–114, 702–205, and 702–206(1)(c)

(1993) (defining intentional state of mind with regard to a result of defendant's conduct). The testimony recapitulated *supra* in section III.A.1.a, if found credible by the jury, was sufficient to justify a person of reasonable caution in drawing the inference and concluding that Valdivia's conscious object, at the time he restrained and dragged Officer Heatherly—who was hanging out of the vehicle—for thirty yards down Kalākaua Avenue, was to inflict bodily injury—*i.e.*, physical pain or an impairment of physical condition, *see* HRS § 707–700 *supra* note 1—upon the officer. That Valdivia may also have intended, as defense counsel argued, to flee from the threat posed by Officer Heatherly's drawn firearm does not render the inference that he intended to inflict bodily injury upon the officer unreasonable. Accordingly, we hold that the prosecution adduced sufficient evidence to justify the jury's verdict in this regard as well.

### 2. Count 3: First degree terroristic threatening

■ Valdivia argues that the prosecution did not adduce substantial evidence from which a person of reasonable caution could conclude that his remark to Officer Kawelo, "I'm gonna kill you and your police uniform," was so "unequivocal, unconditional, immediate[,] and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution," *see State v. Chung*, 75 Haw. 398, 862 P.2d 1063 (1993), and, therefore, that his remark was not a "true threat" but, rather, constitutionally protected speech.[5] Valdivia posits that his remark was equivocal, conditional, and not "immediate" because it was "made . . . after being . . . sprayed [with pepper spray], placed under arrest, handcuffed[,] and transported to the emergency room secured by a seat bar and guarded by two armed police officers" and, moreover, because it was not "accompanied by any sort of threatening movements or attempts to free himself."

The crux of Valdivia's argument is simply that there was "no realistic prospect that [he] would imminently execute the literal words of his [remark] or that he had the ability to do so."

On the record of the present matter, in order to convict Valdivia of first degree terroristic threatening, pursuant to HRS §§ 707–715 and 707–716(1)(c), *see supra* note 2, the prosecution was required, at a minimum, to prove beyond a reasonable doubt that Valdivia threatened, by word, to cause bodily injury to Officer Kawelo in reckless disregard of the risk of terrorizing him. In other words, the prosecution was required to prove two things: (1) that, under the circumstances, Valdivia's remark threatened to cause bodily injury to Officer Kawelo—that is, that his words (the conduct element) bore the attributes of a "true threat" (the attendant circumstances element), *see* HRS § 702–205; *Chung, supra;* and (2) that he recklessly disregarded the risk that his remark would terrorize Officer Kawelo (the requisite state of mind). As the commentary to HRS § 707–715 explains, the gravamen of the offense of terroristic threatening is "conduct causing serious alarm for personal safety[.]" Thus, according to the commentary, the offense of terroristic threatening proscribes words or conduct that constitute a threat of bodily injury because such inchoate threats induce a "personal apprehension of danger," rather than because there is a "possibility [that] the threatened evil [will actually be] accomplished." Commentary on HRS § 707–715. As we discuss *infra*, Valdivia's argument—*i.e.*, that because the prosecution's evidence did not establish that there was a possibility that the evil Valdivia threatened (literally killing Officer Kawelo) would be accomplished without temporal delay, he therefore cannot be guilty of terroristic threatening—is flawed.

Valdivia relies heavily upon *Chung, supra.* Chung was a high school teacher disgruntled with the principal of the public school at

---

5. The first amendment to the United States Constitution, made applicable to the states through the due process clause of the fourteenth amendment, provides in relevant part that "Congress shall make no law . . . abridging the freedom of speech[.]" *See Chung*, 75 Haw. at 415, 862 P.2d

at 1072 (citing *Rankin v. McPherson*, 483 U.S. 378, 386 & n. 9, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). Article I, section 4 of the Hawai'i Constitution (1978) similarly provides in relevant part that "[n]o law shall be enacted . . . abridging the freedom of speech[.]"

which he taught. *Chung*, 75 Haw. at 403–06, 862 P.2d at 1067–69. Chung expressed his frustration with the principal to a colleague and asserted, "[A] day doesn't pass that [I] don't feel like killing myself[.] ... I think I'll bring a gun[;] I'll shoot the principal and shoot myself." *Id.* at 403–404, 862 P.2d at 1067. On the same day, Chung made similar remarks to other colleagues and displayed a firearm and ammunition to several of them. *Id.* at 404–405, 862 P.2d at 1067–68. Chung's colleagues reported the threats to the vice principal, and the principal was advised of at least two of these reports. *Id.* at 405, 862 P.2d at 1068. Although Chung, on the day he uttered the foregoing statements, had been placed on a ten-day paid administrative leave, he nevertheless appeared at the school the following day carrying a concealed firearm and, shortly thereafter, was apprehended by two police officers. *Id.* at 405–406, 862 P.2d at 1068.

On appeal, this court held that the circuit court erred in dismissing terroristic threatening charges against Chung because the circuit court incorrectly concluded that his remarks were constitutionally protected speech. *Id.* at 415, 862 P.2d at 1072. In doing so, this court relied on *United States v. Kelner*, 534 F.2d 1020 (2d Cir.), *cert. denied*, 429 U.S. 1022, 97 S.Ct. 639, 50 L.Ed.2d 623 (1976), noting that the question presented by Chung was identical to that addressed by the *Kelner* court, to wit, "whether an unequivocal threat which has not ripened by any overt act into conduct in the nature of an attempt is nevertheless punishable under the First Amendment [to the United States Constitution], even though it may additionally involve elements of expression." *Chung*, 75 Haw. at 415, 862 P.2d at 1072 (quoting *Kelner*, 534 F.2d at 1026). In other words, the issue in *Kelner*, as it is in the present matter, was the point at which speech ceases to be cloaked with constitutional protection and becomes subject to criminal prosecution as a "true threat" to cause bodily injury.

In *Chung*, we held that "the short answer" was relatively simple: "[A] statement that amount[s] to a threat to kill ... [is] not protected by the First Amendment[.]" *Id.* at 415–16, 862 P.2d at 1072 (quoting *Rankin v.*

*McPherson*, 483 U.S. 378, 386–87, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)) (some brackets added and some in original). The rationale underlying the "answer," we explained, "was aptly articulated," for the purposes of deciding *Chung*, by the *Kelner* court:

> [T]he word "threat" ... exclude[s] statements which are, when taken in context, not "true threats" because they are conditional and made in jest[.] ... [T]hreats punishable consistently with the First Amendment [are] only those [that,] according to their language and context[,] convey[ ] a gravity of purpose and likelihood of execution so as to constitute speech beyond the pale of protected "vehement, caustic[, and] unpleasantly sharp attacks.["] ...
>
> ... [P]roof of a "true threat" ... focuse[s] on threats which are so unambiguous and have such immediacy that they convincingly express an intention of being carried out....

*Chung*, 75 Haw. at 416, 862 P.2d at 1072–73 (quoting *Kelner*, 534 F.2d at 1026–27) (citation omitted) (some brackets and ellipsis points added and some in original). In other words, inasmuch as a remark, such as a joke or caustic hyperbole, is not susceptible to an interpretation that would place an objective, reasonable recipient, at whom the remark was directed and who was familiar with the context in which it was uttered, in reasonable fear for his or her personal safety, it therefore falls within the ambit of free speech protected both by the United States and Hawaiʻi Constitutions and cannot predicate a terroristic threatening conviction. *See, e.g., United States v. Sovie*, 122 F.3d 122, 125 (2d Cir.1997) (observing that the *Kelner* test of a "true threat" is "an objective one—namely, whether an ordinary, reasonable recipient [of the threat] who is familiar with the context of the [threat] would interpret it as a threat of [bodily] injury" (quoting *United States v. Malik*, 16 F.3d 45, 49 (2d Cir.1994)) (some brackets added and some in original)).

Thus, we agreed in *Chung* with the *Kelner* court that a remark threatening bodily injury ceases to be constitutionally protected and ripens into a "true threat" when it is objectively susceptible to an interpretation that could induce fear of bodily injury in a reason-

able recipient, at whom the remark is directed and who is aware of the circumstances under which the remark was made, because those circumstances reflect that the threatening remark was "so unequivocal, unconditional, immediate[,] and specific as to the person threatened, [that it] convey[ed] a gravity of purpose and imminent prospect of execution." 75 Haw. at 416–17, 862 P.2d at 1073 (quoting *Kelner*, 534 F.2d at 1027). Applying the foregoing to the facts in *Chung*, we held that because (1) Chung repeatedly expressed his intention to shoot the principal at the school while displaying a firearm and ammunition, (2) his remarks were sufficiently and objectively alarming to impel a recipient to report them to the vice principal, and (3) his presence at the school was unauthorized at the time, Chung's remarks constituted "true threats." *Id.* at 417, 862 P.2d at 1073.

■ As our discussion reflects, *Chung* judicially narrowed the meaning of the word "threat," as employed in HRS § 707–715, in order to salvage the statutes defining terroristic threatening offenses from unconstitutional overbreadth. As a result, *Chung* mandates that, in a terroristic threatening prosecution, the prosecution prove beyond a reasonable doubt that a remark threatening bodily injury is a "true threat," such that it conveyed to the person to whom it was directed a gravity of purpose and imminent prospect of execution. In other words, the prosecution must prove beyond a reasonable doubt that the alleged threat was objectively capable of inducing a reasonable fear of bodily injury in the person at whom the threat was directed and who was aware of the circumstances under which the remarks were uttered. Under the particular circumstances of *Chung*, as we have indicated, the "true threat" was "so unequivocal, unconditional, immediate[,] and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution."

Applying the foregoing paradigm to the present matter, the facts that Valdivia had been pepper sprayed, arrested, handcuffed, and transported to a hospital did not, in themselves, render his remark to Officer Kawelo "equivocal." The circumstances did not inject ambiguity or doubt into, or otherwise dilute the clarity of, Valdivia's declaration, "I'm gonna kill you." Similarly, simply

because Valdivia did not elaborate upon when or how he would kill Officer Kawelo did not render his remark "conditional." Failing to articulate the manner by which he would carry out his threat did not imbue his remark with any qualification or limitation. Finally, Valdivia does not contend that his remark lacked the requisite specificity as to the person threatened, nor could he, insofar as Officers Kawelo and Kailihou testified that Valdivia looked directly at Officer Kawelo at the time he uttered it. Thus, Valdivia's claim of "insufficiency of the evidence" hinges on whether his remark was "immediate," such that it bore an "imminent prospect of execution."

■ We have not had occasion to revisit *Chung* and determine whether, as Valdivia's argument presupposes, the "imminency" required to establish a "true threat" is constitutionally restricted to *temporal* immediacy, such that a "threat" is a "true" one only if it can be executed "without lapse of time [or] delay," "instantly," or "at once." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 712 (1989) (defining "immediately"). In our view, neither the free speech clause of the United States Constitution nor that of the Hawai'i Constitution, *see supra* note 5, impose a temporal "immediacy" requirement that must be met before words become subject to criminal prosecution as "true threats."

The context of *Kelner*, which was the source of the "true threat" standard that we adopted in *Chung*, is instructive. The relevant federal statute purported to criminalize any "threat to injure the person of another" that was transmitted in interstate commerce. *Kelner*, 534 F.2d at 1020 & n. 1. The threat at issue—*i.e.*, that "we" were "planning to assassinate [Yasser] Arafat"— was uttered by a member of the Jewish Defense League, who was armed and dressed in paramilitary clothing, during a press conference conducted after a political demonstration that protested Arafat's address to the United Nations. *Id.* at 1020–21. Addressing the constitutional limits of the statute's application to Kelner's utterance, the *Kelner* court expressed its belief that "limit[ing] ... the word 'threat'" to "threats ... which according to their language and context convey[ ] a gravity of

purpose and likelihood of execution so as to constitute speech beyond the pale of protected [speech]" satisfied "First Amendment concerns as fully as would [a] ... requirement that specific intent to carry out the threat be proven." *Kelner,* 534 F.2d at 1026 (citation and footnote omitted). Thus, under *Kelner,* it was a threat's "gravity of purpose and *likelihood* of execution" that ultimately placed it "beyond the pale" of constitutionally protected expression. *Id.* (emphasis added).

In *In re M.S.,* 10 Cal.4th 698, 42 Cal. Rptr.2d 355, 896 P.2d 1365 (1995), the California Supreme Court had occasion to construe *Kelner* in the context of a "hate crimes" statute, which provided in relevant part that "no person shall be convicted of violating [this statute] based upon speech alone, except upon a showing that the speech itself threatened violence against a specific person ... and that the defendant had *the· apparent ability to carry out the threat." Id.* at 706–707 & n. 1, 42 Cal.Rptr.2d 355, 896 P.2d at 1368–69 & n. 1 (emphasis added). In response to the defendants' argument that the statute was unconstitutionally "overbroad because it fail[ed] to require that a punishable threat be unconditional and imminent," the *M.S.* court ruled that the defendants were mistaken "in assuming that the First Amendment always requires the threatened harm to be imminent for the threat to be constitutionally punishable. It does not." *Id.* at 711, 42 Cal.Rptr.2d 355, 896 P.2d at 1372. Reading *Kelner* in context, and bearing in mind that, at the time Kelner threatened Arafat, Arafat had not yet arrived in the United States and there was no evidence that he was even aware that Kelner had uttered the threat, the *M.S.* court noted that "the *Kelner* court found the requisite immediacy in the fact the defendant professed the present ability to carry out the threat to kill Arafat: ' "We have people who have been trained and who are out now[.]" ' " *Id.* at 712, 42 Cal.Rptr.2d 355, 896 P.2d at 1372 (quoting *Kelner,* 534 F.2d at 1028). Because, among other things, the California hate crimes statute expressly required that the defendant possess the "apparent ability" to carry out the threat, which the *M.S.* court construed to mean that "the threat must be one that would reasonably tend to induce

fear in the victim," the "imminency" requirement imposed in *Kelner—i.e.,* that the threat bore a "likelihood of execution"—was functionally satisfied. *Id.* at 712–15, 42 Cal. Rptr.2d 355, 896 P.2d at 1372–74.

We agree with the California Supreme Court that the "imminency" required by *Kelner,* and hence by *Chung,* can be established by means other than proof that a threatening remark will be executed immediately, at once, and without delay. Rather, as a general matter, the prosecution must prove that the threat was objectively susceptible to inducing fear of bodily injury in a reasonable person at whom the threat was directed and who was familiar with the circumstances under which the threat was uttered. *See Sovie,* 122 F.3d at 125; *cf. In re M.S.,* 10 Cal.4th at 711–715, 42 Cal.Rptr.2d 355, 896 P.2d at 1372–74. Of course, one means of proving the foregoing would be to establish, as in *Chung* and *Kelner,* that the threat was uttered under circumstances that rendered it "so unequivocal, unconditional, immediate[,] and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *See Chung,* 75 Haw. at 416–17, 862 P.2d at 1073; *Kelner,* 534 F.2d at 1026–27. But another would be to establish that the defendant possessed "the apparent ability to carry out the threat," such that "the threat ... would reasonably tend to induce fear [of bodily injury] in the victim." *In re M.S.,* 10 Cal.4th at 712–15, 42 Cal. Rptr.2d 355, 896 P.2d at 1372–74.

In light of the foregoing, Valdivia's argument that his utterances lacked the requisite "immediacy" because, at the time, he was handcuffed misses the mark, being no more than an assertion that there was no possibility of the threatened evil being accomplished at the instant of its expression. Given the evidence that pepper spray had little or no effect on Valdivia's power of resistance and that it required four police officers to physically apprehend him, the jury could find that Valdivia possessed the apparent ability to carry out his threat and that the threat would reasonably tend to induce fear of bodily injury in Officer Kawelo.˙ Accordingly, we hold that prosecution adduced substantial evidence from which a person of reasonable caution could conclude that Valdivia, in fact, uttered a "true threat."

### B. *Jury Instructions*

Valdivia next asserts (1) that the circuit court's jury instruction defining a "true threat" was a prejudicially insufficient statement of law and (2) that the circuit court erred in refusing to instruct the jury, "where a threat is directed at a police officer, . . . that police officers are trained to a professional standard of behavior that ordinary citizens might not be expected to equal."

1. *The circuit court insufficiently instructed the jury with respect to what constitutes a "true threat."*

 The circuit court, partially in accord with *Chung*, instructed the jury that, "[t]o constitute a threat punishable by law, the threat on its face and in the circumstances in which it is made must be so unequivocal, unconditional, immediate[,] and specific as to the person threatened as to convey a gravity of purpose." The instruction, as Valdivia originally proposed it, was modified by the circuit court, over Valdivia's objection and without explanation, to delete the final phrase from the operative language of *Chung*, to wit, "and imminent prospect of execution." However, the circuit court further instructed the jury that, with respect to the requisite state of mind, " '[i]n reckless disregard of the risk of terrorizing another person' means that the defendant recklessly disregarded the risk that his words or actions could cause another person serious alarm for his personal safety." The circuit court also instructed the jury that "[t]he law does not require that the person actually experience such an alarm for personal safety, but that the person could have experienced such an alarm."

As our discussion *supra* in section III.A.2 reflects, the foregoing instructions did not sufficiently inform the jury that, to constitute a "true threat," Valdivia's threatening utterance was objectively susceptible to inducing fear of bodily injury in a reasonable person at whom the threat was directed and who was familiar with the circumstances under which the threat was uttered. Absent some appropriate language regarding "imminency," *see supra* section III.A.2, we cannot say that the jury was sufficiently instructed with respect to differentiating a "true threat" from constitutionally protected free speech.[6] Inasmuch as erroneous instructions are presumptively harmful, *see Valentine*, 93 Hawai'i at 204, 998 P.2d at 484, and it does not affirmatively appear from the record as a whole that the error was not prejudicial—in that there is a reasonable possibility that the error may have contributed to Valdivia's conviction of first degree terroristic threatening—, *see id.*, we must remand this matter for a new trial with respect to that offense.

2. *The circuit court further erred in refusing to instruct the jury that, in the context of a terroristic threatening prosecution, the attributes of the defendant and the complainant may be taken into consideration in assessing whether, under the circumstances, the defendant's remark was a "true threat."*

Valdivia further contends that the circuit court erred in refusing, over his objection, to

---

6. In this regard, we observe that, although the word "immediate" was included in the circuit court's "true threat" instruction, the instruction, when read as a whole, associated "imminency" only with the threat's "gravity of purpose." As such, the jury was merely required to find, in essence, that Valdivia "meant it" when he uttered the threat. As our discussion reflects, however, in order to convict Valdivia of terroristic threatening, the jury was required to find that the alleged threat was susceptible to an objective interpretation that would induce a reasonable fear of bodily injury in the person at whom it was directed and who was familiar with the circumstances under which the threat was uttered. In other words, the jury was required to find that both a gravity of purpose (*i.e.*, that Valdivia "meant it") *and* an imminent prospect of execu-

tion (*i.e.*, that it reasonably appeared to the object of the threat that it could be carried out) attended the words alleged to constitute the criminally culpable threat. That the jury found that Valdivia's words were "so immediate . . . as to convey a gravity of purpose" and, thus, that he "meant it," is not consubstantial with a finding that the words were "so immediate . . . as to convey an imminent prospect of execution" and, thus, that it reasonably appeared to Officer Kawelo that the threat could be carried out. That being the case, absent some instruction regarding "imminency," the jury was not required to find that the threat was objectively susceptible to an interpretation that would induce a reasonable fear of bodily injury in the person at whom it was directed and who was familiar with the circumstances under which it was uttered.

instruct the jury that, "[w]here a threat is directed at a police officer, you may consider that police officers are trained to a professional standard of behavior that ordinary citizens might not be expected to equal." Valdivia drew his proposed instruction from *In the Interest of Doe*, 76 Hawai'i 85, 869 P.2d 1304 (1994). In that case, we addressed the offense of harassment, as proscribed by HRS § 711–1106(1)(b) (1985), two elements of which required that the defendant insult, taunt, or challenge another person in a manner "likely to provoke a violent response." We declared that, "where abusive speech is directed at . . . a police officer, it must generally be coupled with . . . outrageous physical conduct, . . . which exacerbates the risk that the officer's training and professional standard of restrained behavior will be overcome such that the officer will be provoked into a violent response[.]" 76 Hawai'i at 96, 869 P.2d at 1315 (emphasis, internal quotation signals, and citations omitted).

■ Unlike harassment, which requires a "likely" response to a defendant's remark from the person to whom the remark is directed, terroristic threatening does not, by its terms, require that the complainant actually be terrorized. *See State v. Alston*, 75 Haw. 517, 540, 865 P.2d 157, 169 (1994) ("the offense of terroristic threatening does not require that the person to whom the threats are directed actually be terrorized by the threats"). Nonetheless, as we have said, in order for an utterance to constitute a "true threat," it must be objectively susceptible to inducing fear of bodily injury in a reasonable person at whom the threat is directed and who is familiar with the circumstances under which the threat is uttered. *See supra* section III.A.2. That being the case, the particular attributes of the defendant and the subject of the threatening utterance are surely relevant in assessing whether the induced fear of bodily injury, if any, is objectively reasonable.

■ Thus, while not directly on point, given the distinction between the offenses of harassment and terroristic threatening, the gist of *Doe* nevertheless applies in the context of a prosecution for terroristic threatening. As such, the jury in the present matter should have been instructed that it could consider relevant attributes of both the defendant and the subject of the allegedly threatening utterance in determining whether the subject's fear of bodily injury, as allegedly induced by the defendant's threatening utterance, was objectively reasonable under the circumstances in which the threat was uttered. Because we cannot say that the failure of the circuit court to so instruct the jury in the present matter did not contribute to Valdivia's conviction of first degree terroristic threatening, we hold that this omission yields an alternative ground for remanding Valdivia's first degree terroristic threatening conviction for a new trial.

C. *Any Misconduct Committed By The DPA Was Harmless Beyond A Reasonable Doubt.*

■ Finally, Valdivia contends that his convictions must be reversed, and reprosecution barred, because of prosecutorial misconduct. Valdivia isolates two instances of alleged misconduct during the DPA's opening statement and six during his closing and rebuttal arguments. In examining the record to determine whether there is a reasonable possibility that the error complained of might have contributed to a defendant's conviction, thereby warranting, at the very least, a new trial, we consider: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant. *Rogan*, 91 Hawai'i at 412, 984 P.2d at 1238.

1. *Opening statements*

Valdivia argues that the DPA resorted to inflammatory argument twice during his opening statement. First, the DPA asserted that Valdivia "went on a rampage of terror," which, "[w]ithin a one-hour period, . . . almost killed at least 100 people." Valdivia's counsel objected to the remark as argumentative, but the objection was overruled, and, consequently, no curative instruction was given. On appeal, Valdivia notes that "[t]here was absolutely no evidence presented during trial that 'at least 100 people' were 'almost killed' " as a result of his November 3, 1999 conduct. Second, the DPA compared Valdi-

via to a dog: "But the funny thing is[,] Mr. Valdivia is like this. He's just leaning against the hood of his own car, and he's just staring. He's just staring at Mr. Ihara. Not saying anything, just staring him cold, like a dog. Looking at him. Doesn't say anything. Just—[.]"[7] Defense counsel's objection to the statement as argumentative was sustained; however, the remark was not stricken, nor did defense counsel request that it be, and a curative instruction was not given to the jury.

Although the circuit court did not curatively instruct the jury regarding the DPA's statements at the time they were made, the court did instruct the jury, before opening statements began, that counsels' opening statements were not evidence and were not to be treated as such:

> The purpose of the opening statement is to allow the attorneys to give you an outline of the evidence they expect to be presented during the course of the trial. And the opening statement is designed to assist you in receiving and evaluating the evidence.

> But opening statements are not evidence. And what the attorneys say during opening statements is not evidence, and you're not to consider it as evidence in your deliberations in this case. The evidence will come from the witnesses and exhibits that will be received during the course of the trial.

Moreover, the circuit court reiterated the substance of the foregoing instruction twice during its general instructions to the jury, which were given before counsels' closing arguments. The court instructed the jury that "[s]tatements or remarks made by counsel are not evidence. You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence." And again, just before the DPA commenced his closing argument, the circuit court instructed the jury:

Ladies and gentlemen of the jury, at this time the attorneys will be given their opportunity to make final or closing arguments to you. This is the time when attorneys sum up the facts and argue their respective cases and give you their positions with respect to what the facts show and the facts are applied to the law, or the law is applied to the facts.

Although you are to pay careful attention to the arguments and may consider counsel's recollections of the facts, you are not bound by their recollection or interpretations, and what the attorneys say to you in closing arguments is not evidence. It is only their respective positions as to what the evidence has shown or has not shown. The actual evidence which you are to consider in your deliberations has come from the testimony of witnesses and the exhibits which have been received into evidence; and when you retire to the jury room, you must rely on your own collective recollection of the evidence in reaching a decision in this case.

Generally, "[a]n opening statement merely provides an opportunity for counsel to advise an[d] outline for the jury, the facts and questions in the matter before them." *State v. Sanchez*, 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App.), *cert. denied*, 84 Hawai'i 127, 930 P.2d 1015 (1996) (quoting *State v. Simpson*, 64 Haw. 363, 369, 641 P.2d 320, 324 (1982) (citations omitted)). Thus, an attorney's opening statement "is not an occasion for argument." *Id.* (citation omitted). As the Intermediate Court of Appeals has explained:

> Ordinarily, "the scope and extent of the opening statement is left to the sound discretion of the trial judge." ... However, the trial court should "exclude irrelevant facts and stop argument if it occurs." ... The [prosecution] should only refer in the opening statement to evidence that it has "a genuine good-faith belief" will be produced at trial.

*Id.* (citations omitted). Moreover, "[w]here the nature of the prosecutorial misconduct

---

7. Tetsuo Ihara was the complainant in connection with count 5, which charged Valdivia with terroristic threatening in the second degree, in violation of HRS § 707–717(1). Ihara was the driver of the vehicle situated outside the Waikīkī substation; according to Ihara, Valdivia approached him and asserted that he would "be dead in half an hour" because Ihara could not identify two women depicted in a photograph that Valdivia displayed to him.

alleged is the failure of the prosecutor to prove or attempt to prove matters referred to in opening statements, . . . the burden [is] on the defendant to show bad faith on the part of the prosecutor, unless the fundamental rights of the defendant were substantially prejudiced." *State v. Moore*, 82 Hawai'i 202, 213, 921 P.2d 122, 133 (1996) (adopting the "majority" approach).

 In light of the foregoing authority, the DPA's "rampage of terror" remark and "like a dog" simile constituted argument that was improper in an opening statement. Moreover, the DPA's assertion that Valdivia's conduct "almost killed at least 100 people" was obviously a blatant overstatement of what he intended to prove at trial, given the charges in the present matter and the testimony of the witnesses adduced by the prosecution during trial, and could not possibly have been uttered other than in bad faith and with the intention of inflaming the jury's passions.[8]

 As we have noted, the circuit court did not give a curative instruction at the time the DPA made his improper remarks, although the court did generally instruct the jury no less than three times that the statements and arguments of counsel were not evidence and were not to be considered as such during the jury's deliberations. In any event, we cannot say that the evidence against Valdivia, with regard to the three charges that were potentially reversible due to the DPA's misconduct, *see supra* note 3, was so weak, *see supra* sections I, III.A.1, and III.A.2, as to weigh in favor of finding the misconduct prejudicially harmful.

Given the circuit court's general instructions to the jury, and absent any indication in the record that the jury failed to adhere to these instructions, we cannot say that the DPA's misconduct during his opening statement contributed to Valdivia's convictions. Accordingly, the misconduct was harmless beyond a reasonable doubt.

### 2. *Closing and rebuttal arguments*

Valdivia isolates six instances of alleged prosecutorial misconduct during the DPA's closing and rebuttal arguments. We address each in turn.

#### a. *Misleading the jury*

 Valdivia asserts that the DPA attempted to mislead the jury "into believing that any statements which the witnesses had adopted as not being part of their reports were not evidence." While discussing the charge of second degree terroristic threatening, which the prosecution alleged Valdivia had committed against Ihara, *see supra* note 6, the DPA stated:

. . . [A]s to TT II, Mr. Ihara, Mr. Ihara is just driving down the road, minding his own business, and he doesn't know what's going on. But he came in here and he told you, and afterwards he wrote a report, and after he got home, he wrote another report. Why? Well, not a report, he wrote it for himself so he could remember. Why? Because he was so scared and shaken up after this happened, he didn't get everything down in his [first] report.

And the reason why I mention that is because when the defense attorney gets up here, you're going to hear about how people didn't write things in their reports, or they didn't say things before, so now they must be lying. Okay? Reports are just that. They are not evidence. You did not get anybody's report in evidence. What you got—

Defense counsel objected on the ground that the DPA had misstated the law and requested a bench conference. During the bench conference, defense counsel argued:

Your Honor, this is misleading to the jury. This is misleading. The jury did not receive any report into evidence. What they adopted as true about cross-examination regarding reports is evidence. So when the prosecutor says, yes, I did put something in my report, the [fact is] that they didn't get the report. Whatever he said about the report they adopted from cross-examination is evidence.

---

8. Thus, we note that the circuit court erred in overruling Valdivia's objection to the DPA's "rampage of terror" and "almost killed a 100 people" remarks.

The circuit court sustained the objection and informed the DPA that he needed to rephrase his argument; the remark was not stricken, defense counsel having made no such request, and no curative instruction was given to the jury.

On appeal, Valdivia reasserts that the DPA's statement was an "attempt[ ] to mislead the jury on the applicable law," insofar as the DPA "stat[ed] that statements adopted on cross-examination based on the police reports were not evidence." We disagree that the DPA's statement was misleading in that manner. In context, the DPA was clearly referring to Ihara's statement to the police and to his subsequent written "report." The DPA was not referring to police reports. But, even if the DPA's remarks were susceptible to such a construction, he was still simply and correctly noting that the reports themselves (Ihara's, as well as those of the various police officers who testified) had not been received into evidence as exhibits and, thus, were not a part of the record.

Accordingly, we do not believe that the DPA's statements regarding the evidentiary value of Ihara's previous statement and report constituted misconduct in the first instance; thus, we need not consider whether the statement was harmless beyond a reasonable doubt.

b. *Commenting on defense's failure to adduce evidence, specifically, testimony of Valdivia*

■ Valdivia asserts that the DPA remarked as follows on his failure to testify and to adduce any evidence:

... Ladies and gentlemen, a lot of evidence, a lot of testimony, a lot of things for you to consider. But if you remember common sense, what happened[,] and what is in evidence. And remember, opening statements are not evidence. And opening statements, you heard things [from defense counsel] about, oh, it's a mistake, the officer got tangled, this and that. Okay? That was not the evidence that was presented to you. The evidence that was presented to you about the kidnapping and the arm being pinned in the car—

Defense counsel objected, arguing during a bench conference that the foregoing statements were a "flagrant effort ... to make a comment on the fact that defense did not present any evidence, and [did] not present Mr. Valdivia to testify[.]" Defense counsel maintained that the DPA had, *inter alia,* "comment[ed] on the defendant's right to remain silent."

The circuit court overruled the objection but noted that it thought "Mr. Bakke has improperly commented on the defendant's exercise of his constitutional right [to remain silent]." The circuit court cautioned the DPA to "restrict [his] argument to the fact that what was said in opening statements are not evidence, without trying to characterize it any way." The DPA's statements, however, were not stricken, nor did defense counsel move for them to be, and no curative instruction was given to the jury.

This court has said that "[t]he test to be applied" in determining whether a prosecutor has improperly commented upon a defendant's failure to testify is "whether the language used was 'manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *State v. Padilla,* 57 Haw. 150, 158, 552 P.2d 357, 363 (1976) (quoting *United States v. Wright,* 309 F.2d 735, 738 (7th Cir.1962)). Utilizing this formulation, we disagree with Valdivia that the DPA's statement constituted misconduct. The most that can be said is that the DPA was highlighting the fact that the evidence adduced at trial did not comport with defense counsel's assertions during opening statements. So construed, the DPA's remark appears to be "within the bounds of legitimate argument," inasmuch as a prosecutor is, in closing argument, given "wide latitude ... in discussing the evidence" and may "state, discuss, and comment on the evidence as well as draw all reasonable inferences therefrom." *State v. Clark,* 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996) (citations omitted). Moreover, the statement did not expressly refer to Valdivia or to the fact that he did not testify. We do not believe that the jury would foreseeably interpret the DPA's statement as a comment on Valdivia's failure to testify. Accordingly, we hold that

the DPA's statement did not constitute prosecutorial misconduct in the first instance and need not reach the question whether it was harmless beyond a reasonable doubt.

#### c. Statements reflecting the DPA's personal opinions

The final four statements that Valdivia posits constitute prosecutorial misconduct all involve the DPA allegedly asserting his personal opinions during rebuttal argument.

First, the DPA remarked:

Ladies and gentlemen, these charges are not trumped up because officers are lying or that this is some blue wall of conduct, that they're trying to get even for what this guy did to some of their officers. Remember, the person he almost killed was the person that was in that green car. Maybe he should have been charged with attempted murder.

Defense counsel's objection was sustained, and the circuit court ordered the statement stricken and instructed the jury to disregard it.

Second, Valdivia asserts that the DPA once again offered his personal opinion when arguing that Officer Heatherly had not lied during his testimony: "Fairness, integrity, respect. You heard the [dispatch] tape, listen to the tapes, listen to what they did that day. When I look at those injuries—[.]" Defense counsel's objection was sustained, but the DPA's statement was not stricken, nor did defense counsel request that it be, and no curative instruction was given.

Third, Valdivia notes that the DPA, after asserting, in response to defense counsel's objection to the foregoing statement, that he would rephrase his argument, then opined that Valdivia should have been shot by the police:

Take a look at those injuries; you see some bruising. Those pictures were taken the day after in cellblock. You know that if you get hit in the head, what happens— in the eye? Officer Kawelo said, yeah, there was something around the eye, maybe some redness, some abrasion. Not that bruising. Bruising doesn't show up for a day or so. Anybody's who's had a bruise has seen a bruise get worse and worse and worse over time.

They're not trying to hide the fact that [Valdivia] got injured, and it's not the fact that he got beaten up. But where's the bullet hole? Do you see any bullet holes in his head? Because he should have had one.

Defense counsel's objection was sustained, and the circuit court ordered the DPA's statement stricken and instructed the jury to disregard it.

Finally, Valdivia asserts that the DPA improperly asserted that he was attempting to deceive the jury. In discussing the inconsistencies in the testimony adduced during trial, the DPA argued:

Officer Kailihou, I didn't see the other guy get maced. The other officers? Yeah, we maced him. Does it make any difference in the scheme of things? No. Are they lying about everything, do you throw out their testimony? No, okay? That's what Defense wants you to do. They want you to say, you know what, you believe the officers for these traffic-type offenses that we just can't argue our way out of, and then—

Defense counsel's objection was sustained, and the circuit court ordered the DPA's statement stricken and instructed the jury to disregard it.

After the DPA completed his rebuttal argument, defense counsel requested surrebuttal and, in the alternative, moved for a mistrial. The circuit court denied both defense counsel's request for surrebuttal and her motion for a mistrial because the DPA's "[c]omments ... for which the objections were sustained were stricken, and the jury was told to disregard it[.]"

■■■■ The DPA's comments that Valdivia should have been charged with attempted murder and shot in the head were flagrantly improper and clearly constituted inflammatory assertions of the DPA's personal opinion. See, e.g., State v. Marsh, 68 Haw. 659, 660–61, 728 P.2d 1301, 1302 (1986). However, objections to both comments were sustained, they were immediately stricken, and the jury was promptly instructed to disregard them.

In addition, as we noted *supra* in section III.C.1, the jury was instructed no less than three times that statements and arguments of counsel were not evidence and should not be considered as such. Moreover, as we also noted *supra* in section III.C.1, the evidence against Valdivia was not so weak as to favor finding the remarks harmful. Accordingly, given the prompt curative instructions and the circuit court's general instructions, we cannot say that the DPA's comments, although unprofessional, contributed to Valdivia's convictions. We hold, therefore, that the DPA's statements were harmless beyond a reasonable doubt.

■ With regard to the DPA's remark, "When I look at those injuries," the DPA impliedly conceded, in agreeing to rephrase his argument, that rendering his personal opinion about what he thought when he viewed Valdivia's injuries was improper. *Id.* Although no curative instruction was promptly given, we note that the remark, left unfinished, does not appear on the record before us to have contributed to Valdivia's convictions. As noted above, the evidence against Valdivia was not so weak as to favor holding this inchoate remark prejudicial, and the circuit court more than adequately instructed the jury that statements and arguments of counsel were not evidence and should not be considered as such during its deliberations. Thus, we hold that this particular remark was harmless beyond a reasonable doubt.

■ Regarding the "blue wall of conduct" comment that, according to Valdivia, constitutes prosecutorial misconduct, we hold that it was not an improper assertion of personal opinion regarding Valdivia's credibility. *See Clark*, 83 Hawai'i at 304–306, 926 P.2d at 209–211 (remark characterizing defendant's testimony as a "cockamamie story" held to be "well within the limits of propriety"). Valdivia did not testify, and, thus, his credibility as a witness was not before the jury. To the extent that the comment urged the jury not to credit the defense's "blue wall" theory urging the jury to find the testimony of the officers unbelievable, we do not believe that the comment was improper. *See id.* Accordingly, it did not constitute prosecutorial misconduct in the first instance, and we need not consider whether it was harmless beyond a reasonable doubt.

Given that any improper remarks by the DPA were harmless beyond a reasonable doubt, their cumulative effect was similarly harmless and did not deprive Valdivia of a fair trial. Thus, the DPA's misconduct in the present matter, not warranting reversal of any of Valdivia's convictions, does not implicate the *Rogan* holding or the double jeopardy clauses of either the United States or Hawai'i Constitutions. *Cf. Rogan*, 91 Hawai'i at 415–24, 984 P.2d at 1242–50.

### IV. CONCLUSION

In light of the foregoing, we vacate the circuit court's judgment of conviction of and sentence for terroristic threatening in the first degree in connection with count 3 and remand for a new trial as to that offense. In all other respects the circuit court's judgment of conviction and sentence in the present matter is affirmed.