**Electronically Filed
Supreme Court
SCWC-17-0000226
03-JAN-2020
08:19 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---oOo---

_____

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee,

vs.

PATRICK WILLIAMS, Petitioner/Defendant-Appellant.

_____

SCWC-17-0000226

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-17-0000226; 1FC151000047)

JANUARY 3, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.   Introduction

Patrick Williams ("Williams") was charged with assault in the second degree[1] against his two-year-old son ("minor son") in violation of Hawai'i Revised Statutes ("HRS") § 707-711(1)(a)

---

[1]     HRS § 707-711 (2014) states: **"Assault in the second degree.**  (1) A person commits the offense of assault in the second degree if: (a) The person intentionally or knowingly causes substantial bodily injury to another; (b) The person recklessly causes serious or substantial bodily injury to another . . . ."

and/or § 707-711(1)(b),[2] via an August 11, 2015 indictment in the Family Court of the First Circuit ("family court").[3] On January 12, 2017, a jury found Williams guilty of the lesser included offense of assault in the third degree, in violation of HRS § 707-712.[4] On March 28, 2017, the family court[5] entered its final judgment, sentencing Williams to one year of probation.

---

[2] The indictment read:

> On or about September 21, 2014 to and including September 22, 2014, in the City and County of Honolulu, State of Hawai'i, PATRICK WILLIAMS, being the parent or guardian or any other person having legal or physical custody of [minor son], did intentionally or knowingly cause substantial bodily injury to [minor child], and/or did recklessly cause substantial bodily injury to [minor son], a person less than eighteen years of age, thereby committing the offense of Assault in the Second Degree, in violation of Section 707-711(1)(a) and/or Section 707-711(1)(b) of the Hawai'i Revised Statutes.

[3] The parties and the Intermediate Court of Appeals ("ICA") refer to the trial court as the "circuit court," but the indictment and proceedings were in the family court. At all times pertinent to this case (as well as now), the family court had exclusive original jurisdiction "[t]o try any offense committed against a child by the child's parent or guardian or by any other person having the child's legal or physical custody" pursuant to HRS § 571-14(a)(1) (2018).

[4] HRS § 707-712 (2014) states:

> **Assault in the third degree.** (1) A person commits the offense of assault in the third degree if the person:
> (a) Intentionally, knowingly, or recklessly causes bodily injury to another person; or
> (b) Negligently causes bodily injury to another person with a dangerous instrument.
> (2) Assault in the third degree is a misdemeanor unless committed in a fight or scuffle entered into by mutual consent, in which case it is a petty misdemeanor.

The jury instruction for the lesser included offense of Assault in the Third Degree, the charge on which Williams was found guilty, read as follows:

(continued. . .)

2

Williams appealed the family court's final judgment to the Intermediate Court of Appeals ("ICA"), arguing the family court plainly erred by failing to strike certain improper opening statements made by the deputy prosecuting attorney and by admitting certain x-rays into evidence without the necessary

---

(. . .continued)

>   If and only if you find the defendant not guilty of the offense of Assault in the Second Degree, or you are unable to reach a unanimous verdict as to this offense, then you must consider whether the defendant is guilty or not guilty of the included offense of Assault in the Third Degree.
>
>   A person commits the offense of Assault in the Third Degree if he intentionally, knowingly, or recklessly causes bodily injury to another person.
>
>   There are four material elements of the offense of Assault in the Third Degree, each of which the prosecution must prove beyond a reasonable doubt.
>
>   These four elements are:
>
>   1. That, on or about September 21, 2014, to and including September 22, 2014, in the City and County of Honolulu, the defendant, Patrick Williams, was the parent, or guardian, or any other person having legal or physical custody of [minor son]; and
>
>   2. That the defendant, Patrick Williams, knew or reasonably should have known that [minor son] was less than eighteen years of age; and
>
>   3. That, on or about September 21, 2014, to and including September 22, 2014, the defendant, Patrick Williams, caused bodily injury to [minor son]; and
>
>   4. That the defendant, Patrick Williams, did so intentionally, knowingly or recklessly.

[5]     The Honorable Rom A. Trader presided.

3

foundation.  Williams also argued there was insufficient evidence to sustain his conviction.

In its summary disposition order ("SDO"), the ICA concluded the points of error alleged by Williams lacked merit.  The ICA ruled: (1) although the deputy prosecuting attorney's comments in his opening statement were improper, the family court had instructed the jury to refrain from considering the comments as evidence so, therefore, the error was harmless; (2) there was no reasonable possibility that any error in admitting the contested x-rays into evidence contributed to Williams's conviction; and (3) viewing the evidence in the light most favorable to the State, there was sufficient evidence that Williams at least recklessly caused minor son to suffer bodily injury.  See State v. Williams, No. CAAP-17-0000226, at 4-6 (App. June 15, 2018) (SDO).  The ICA then entered its judgment on appeal affirming the family court's final judgment.

Williams's certiorari application asks that this court address the three issues he had presented to the ICA:

> Whether the ICA gravely erred in holding that: (1) the prosecutor's improper comments constituted harmless error; (2) the [family] court did not err in admitting the x-rays into evidence without the improper [sic] foundation; and (3) there was sufficient evidence to sustain Williams's conviction.

We hold that Williams's conviction on the charge of assault in the third degree must be vacated because the deputy

4

prosecuting attorney's elicitation of evidence regarding Child Welfare Services involvement in violation of a defense motion in limine was improper and not harmless beyond a reasonable doubt.

As we set aside the conviction, we also address the evidentiary foundation issue regarding the x-rays not addressed by the ICA, and hold there was insufficient foundation for admission of the contested x-rays into evidence because the physician through whom the x-rays were introduced was not a custodian or "other qualified witness" able to lay a foundation pursuant to Hawai'i Rules of Evidence ("HRE") Rule 803(b)(6) (2002). We also hold, however, that Williams's conviction on the charge of assault in the third degree was supported by substantial evidence.

Accordingly, we vacate the family court's March 28, 2017 final judgment as well as the ICA's September 25, 2018 judgment on appeal and remand this case to the family court for further proceedings consistent with this opinion.

## II.  Background

### A.   Child Welfare Services Issue

In his January 3, 2017 motion in limine, Williams included a request to exclude "[a]ny reference to an investigation and case by the Child Welfare Services, Department of Human Services, State of Hawai['li and any legal issues stemming from

5

said investigation and case" as item 2.c.  At the January 9, 2017 hearing on Williams's motions in limine, the family court granted this request.

Williams's jury trial took place on January 9, 11, and 12, 2017.  Before the parties' opening statements, the family court explained, "Please remember that what the attorneys say is not evidence.  What actually counts is the sworn testimony of the witnesses and the exhibits or other things that are received as evidence."

During opening statements on January 9, the deputy prosecuting attorney stated:

> [Y]ou will find out that [minor son] is subsequently transferred to another family and reunited with his mother.
>
> You'll meet Detective Melvin Raquedan, who assists with the transfer of custody.  You'll also meet social worker Robert Asato, who aids in the transfer from Tripler Army Medical Center after [minor son] is treated and released and how he is ultimately reunited down the road with his mother.

Williams did not raise a specific objection to these statements.

On January 11, Wiliams's deputy public defender requested an offer of proof regarding what testimony the deputy prosecuting attorney expected to elicit from witnesses Melvin Raquedan of the Honolulu Police Department ("Detective Raquedan") and social worker Robert Asato.  The deputy prosecuting attorney indicated that both witnesses were being called to establish "a material element" of "custody of the

6

child, who was formerly or solely in the defendant's care, and the transfer out of that care." After the deputy public defender objected to any evidence regarding "care out of Mr. Williams' hands," the deputy prosecuting attorney stated that he would not "get into what happened to the child. It's essentially to establish the parent, guardianship care and custody."

The next day, the State called Detective Raquedan as a witness. During his direct examination, the following exchanged occurred:

> [DEPUTY PROSECUTING ATTORNEY]: And in order to explain the next steps you took, what did dispatch request your assistance with?
>
> [WITNESS]: Assist in taking police custody of a minor.
>
> [DEPUTY PUBLIC DEFENDER]: Objection, Your Honor. Violates the motion.[6]
>
> THE COURT: No speaking objections. At the bench please.
> (The following proceedings had at the bench:)
>
> THE COURT: All right. So the objection is violates the motions in limine?
>
> [DEPUTY PUBLIC DEFENDER]: Yes, Your Honor. The concern raised yesterday on record.
>
> THE COURT: All right. At the end of the day in terms of what was discussed at court, I believe I only permitted testimony with respect to what the status of the child and relative to the defendant having care and custody of the

---

[6]   This was presumably the granted motion in limine prohibiting "[a]ny reference to an investigation and case by the Child Welfare Services, Department of Human Services, State of Hawai[']i and any legal issues stemming from said investigation and case," as well as the discussions that had taken place the day before regarding the nature of the evidence to be elicited.

child versus transfer of custody. I believe that was precluded. So where do you intend to go with this?

[DEPUTY PROSECUTING ATTORNEY]: Yes. The prosecution intends to show that in order to have the transfer of custody from the father's care to the State, there needs to be a two-party assistance, and he responded to that in order to work with Mr. Asato. That is what he was given via dispatch and that's all he's going to testify to with respect to assisting in the transfer of the custody.

THE COURT: Okay.

[DEPUTY PROSECUTING ATTORNEY]: But that's what it is. And the State does not intend to get into the details anywhere. But he was the responding officer.

THE COURT: All right. [DEPUTY PUBLIC DEFENDER].

[DEPUTY PUBLIC DEFENDER]: Your Honor, I think that's highly prejudicial -- the fact that two witnesses are needed to establish one of the elements. I think the route that the State is taking is unnecessary and it sheds Mr. Williams in a different light than it would otherwise need to do to establish that same element. I think they can do it in a multiple number of other ways, and I think it still does violate. I don't think --

THE COURT: All right.

[DEPUTY PROSECUTING ATTORNEY]: With respect to the establishment, Detective Raquedan is expected to testify that he actually completed and filled out the protective custody form. On that form [minor son] is known by another name. So he is a necessary material witness to establish that this child was present. And he as well as Robert Asato signed the protective custody --

. . . .

THE COURT: So why is it that you can't simply ask the witness that as part of his duties, did he come into contact with these individuals -- the complainant, and during the course of his investigation or what he did, he ascertained defendant as the parent?

[DEPUTY PROSECUTING ATTORNEY]: Okay. And the State will just proceed that way.

THE COURT: That would essentially permit you to have him testimony [sic] to things that are within his knowledge but without necessarily going beyond what's necessary to establish the elements of the offense. Because what happened with the child happened, which really has no

8

> relevance. And while the defense is claiming that it is highly prejudicial, I'm not so sure that's the case.
>
> [DEPUTY PROSECUTING ATTORNEY]: I'll proceed. I'll move on.
>
> THE COURT: The objection's sustained. And you may proceed as I've indicated.[7]
>
> [DEPUTY PROSECUTING ATTORNEY]: Understood. Thanks.
>
> [DEPUTY PUBLIC DEFENDER]: Thank you, Your Honor.
>
> . . . .
>
> [DEPUTY PROSECUTING ATTORNEY]: And did you ultimately work in tandem with Mr. Asato on behalf of the Department of Human Services?
>
> [WITNESS]: Yes.
>
> [DEPUTY PUBLIC DEFENDER]: Objection, Your Honor.
>
> THE COURT: Sustained. Court will strike that last response. You will not consider it for any purpose whatsoever, ladies and gentlemen.

Although the family court sustained the deputy public defender's objection and struck Detective Raquedan's reference to the "Department of Human Services," of which Child Welfare Services is a part, the State later called social worker Robert Asato to testify, and elicited the following evidence:

> [DEPUTY PROSECUTING ATTORNEY]: Good morning, sir. Can you please tell us your name and occupation for the record.
>
> [WITNESS]: Robert Jason Asato. I'm an investigative social worker, Child Welfare Services.
>
> [DEPUTY PUBLIC DEFENDER]: Objection, Your Honor.
>
> THE COURT: Overruled.

---

[7]      Although the family court sustained the objection, it did not strike the response that prompted the objection, that Detective Raquedan had been requested by dispatch to "[a]ssist in taking police custody of a minor."

[DEPUTY PROSECUTING ATTORNEY]: You can respond. I'm sorry. Tell us your name and occupation again.

[WITNESS]: Robert Jason Asato. Investigative social worker, Child Welfare Services.

[DEPUTY PROSECUTING ATTORNEY]: Thank you. And Mr. Asato, I just have several questions for you. On September 24th, 2014, were you involved or did you come across [minor son]?

[WITNESS]: Yes.

[DEPUTY PROSECUTING ATTORNEY]: And with respect to [minor son], were you able -- during the course of your investigation, able to determine who was the sole caretaker of [minor son] on that date?

[WITNESS]: Yes.

[DEPUTY PROSECUTING ATTORNEY]: And the sole caretaker according to your investigation -- would it be fair to say was his father, Patrick Williams?

[WITNESS]: Yes.

[DEPUTY PROSECUTING ATTORNEY]:  And just to clarify, September 24th 2014, was that the first day that you were assigned and came across [minor son]?

[WITNESS]:  Yes.

In addition, during the testimony of Dr. Jennifer Doerrige ("Dr. Doerrige"), whose testimony is further discussed in the next section, the deputy prosecuting attorney asked, "[D]id you alert authorities after treating [minor son]," to which Dr. Doerrige responded, "Yes. CPS was contacted. That's Child Protective Services."[8]

---

[8]   Although the official term is "Child Welfare Services," it appears "Child Protective Services" or "CPS" is still often used in common parlance.

**B.     Other Trial Evidence Relevant to Issues on Certiorari**

The trial also included the following evidence relevant to the issues on certiorari.

**1.     Testimony of Nurse Santana**

Around 9:30 a.m. on September 22, 2014, Williams brought minor son to Wahiawa General Hospital. That day happened to be minor son's second birthday.

Nurse Santana, who triaged minor son upon his arrival at the hospital, testified she saw an "obvious deformity" in minor son's left femur and that minor son appeared distressed. Williams told her he saw minor son jump off the bed the night before around 10:30 p.m. and that minor son's leg looked more swollen that morning. At around 10:03 a.m., Nurse Santana administered fentanyl, a drug which can cause sleepiness and a dulling of the senses, to minor son.

**2.     Testimony of Nurse Blakey**

Nurse Blakey then assessed minor son at 10:30 a.m. and noted that he was alert and comfortable lying in bed, with Williams at his bedside, and exhibited "no apparent distress" after Nurse Santana had administered fentanyl. Because minor son's condition had stabilized, at around noon, Nurse Blakey assisted in discharging him. Minor son then went to Tripler Army Medical Center ("Tripler") for further treatment.

11

### 3.    Testimony of Dr. Doerrige

Dr. Doerrige was the emergency room physician who treated minor son at Wahiawa General Hospital on September 22, 2014. She conducted a basic physical examination of minor son, and noticed a deformity in his left leg with soft tissue swelling. After discovering an "obvious" left femur fracture, she ordered x-rays and a whole body x-ray called a babygram. Dr. Doerrige diagnosed minor son with a left transverse slightly angulated significantly displaced fracture of the left femur as well as some soft tissue swelling at the site of the fracture.

Dr. Doerrige also opined that, had minor son not been treated, the fracture could have caused serious permanent disfigurement or protracted loss or impairment of the function of his left leg, and that one leg would have been significantly shorter than the other, which would have prevented minor son from running, jumping, hopping, and skipping. Dr. Doerrige further opined that minor son's injury was not consistent with jumping and falling off of a bed onto a carpeted floor. She testified that the femur is a very strong bone that is difficult to break. She testified:

> The story wasn't very consistent because, one, most kids . . . learn to jump between ages of 24 months and 36 months. So the jumping aspect was a little suspect. He might be advanced for his age. And then the fact that it probably would be greater force than that. Not like a two-story bed, but a two-story building that would have that kind of force to generate that kind of fracture.

12

Dr. Doerrige also testified that femur fractures are notoriously painful and that most children would be crying; in a great deal of distress; and unable to walk, stand, or sleep through the night.

Dr. Doerrige also related that while she treated minor son for his injury, Williams was apathetic, "[v]ery aloof and was off to the side. Was texting on his cell phone." She also observed Williams giving minor son fist bumps when minor son was crying after coming back from being x-rayed.

Dr. Doerrige then testified State's Exhibits 10, 11, and 12 showed differing views of a femur fracture, the femur fracture in those exhibits was consistent with her diagnosis and examination of minor son, and the x-rays were a "fair and accurate depiction[] . . . of the left femur fracture sustained by [minor son]." Dr. Doerrige testified the upper left corner of the x-rays noted minor son's name. When the State attempted to move these exhibits into evidence, however, the family court sustained the defense's objection based on lack of foundation, and these x-rays were never received in evidence.

Although Dr. Doerrige had testified she contacted "Child Protective Services" as noted earlier, during cross-examination by the deputy public defender, she also testified she could not rule out accidental trauma.

13

### 4.   Testimony of Dr. Polk

Dr. Norman Polk ("Dr. Polk") served as minor son's diagnostic radiologist at Wahiawa General Hospital.  Dr. Polk had begun practicing medicine in Hawai'i during his residency at Tripler in 1975, where he worked for about four years.

Dr. Polk was on duty as a radiologist at Wahiawa General Hospital on September 22, 2014.  His involvement in minor son's care consisted of viewing radiographs taken of minor son and speaking with Dr. Doerrige regarding his findings.  He opined that minor son had a left femur mid-shaft fracture that was slightly angulated anteriorly.  Dr. Polk also testified there was soft tissue swelling, but the babygram did not reveal any prior fractures.

After being stabilized at Wahiawa General Hospital, minor son had been taken to Tripler for treatment.  The deputy prosecuting attorney then began asking Dr. Polk whether he previously had the opportunity to view several x-ray images apparently taken at Tripler before coming to court that day. Dr. Polk responded that he had seen "the post-treated injury when [minor son] was at Tripler."  The deputy prosecuting attorney then asked Dr. Polk whether in his past experience, he had viewed x-ray images from Tripler.  Dr. Polk then responded

in the affirmative to this question as well as another question regarding whether he relied on images from other hospitals.

The deputy prosecuting attorney then handed State's Exhibit 3 for identification to Dr. Polk and asked him to verify that the name, date of birth, and date of the image was "in line" with the x-rays he had previously reviewed regarding minor son. Dr. Polk agreed that "[t]hey appear[ed] to correlate."

Dr. Polk then began testifying as to what State's Exhibit 3 for identification showed even before it was received in evidence. In summary, he described State's Exhibit 3 as showing a left femur after it had been realigned. Although Dr. Polk did not testify that the image was of minor son's left femur, he stated it "look[ed] [like a] fair and accurate" depiction of minor son's fracture.

The deputy prosecuting attorney then began asking about another Tripler x-ray, a lateral view x-ray of a left femur that had been realigned, marked as State's Exhibit 4. The deputy public defender then objected that Dr. Polk had been testifying regarding exhibits yet to be received in evidence, and also asserted that no proper foundation had been laid for the admission of the x-rays. The family court disagreed and admitted State's Exhibit 3 into evidence. The deputy public

defender raised a running objection to the State's other exhibits.

Dr. Polk then further explained what was depicted in State's Exhibit 3:

> For the sake of discussion, this is the femur, or thigh bone is what people know it as. And this is the fracture here, the mid-portion. And these two pieces of bone have been separated. And if there's no fracture the white line would be contiguous all the way through. The knee doesn't have any obvious fracture. The tibia and fibula, which are the lower leg bones, don't show any obvious fracture. This is the hip. There's no displacement or fracture up here. Basically the fracture involves the midshaft. And now it looks like it's well aligned for orthopedic purposes on this film.
>
> The white lines out here are the plaster cast. And the swelling is -- it's basically adjacent to the area of the fractures. You don't see the same sort of swelling down below.

After foundational questions were asked similar to those asked of State's Exhibit 3, State's Exhibit 4 was also admitted into evidence.

Dr. Polk then also opined that minor son's injury would be consistent with jumping and falling off of a bed only "[i]f the bed was on a second story of a building." He explained as follows:

> Children's bones are unlike old people['s bones] . . . . Children['s] . . . bones tend to bend. . . . So it takes a lot of force to take a young kid's leg -- and the femur is . . . one of the largest and strongest bones in the body -- to take it and actually break it in two pieces, snap it in two and to displace it, . . . that's a lot of force.

He also testified that a broken femur in a two-year-old is a "really unusual" injury, and is often related to non-accidental

16

trauma, such as an automobile accident, falling down the stairs, or blunt force trauma.

### 5.    Testimony of Dr. Happy

Christopher Happy, M.D. ("Dr. Happy"), the chief medical examiner for the City and County of Honolulu, testified for the defense.  Dr. Happy testified he had "review[ed] . . . various X-ray images in [minor son's] case," and opined that a toddler could sustain a femur fracture from jumping and falling off of a bed, even if jumping onto a carpeted surface.  He stated the vast majority of femur fractures are accidental.

### C.    Appeal to the ICA and Application for Writ of Certiorari

On appeal to the ICA, Williams presented three points of error:

> A.    The [family] court plainly erred in failing to strike improper statements made by the prosecutor in opening statement.
>
> . . . .
>
> B.    The [family] court erred in admitting the X-rays[9] into evidence without the necessary foundation.
>
> . . . .
>
> C.    There was insufficient evidence to sustain Williams's conviction of Assault in the Third Degree.

The ICA rejected the challenges.  As to the first issue, the ICA applied a plain error analysis on the grounds that

---

[9]    In his opening brief, Williams took issue with the admission of State's Exhibits 3, 4, 10, 11, and 12.  However, the family court did not admit State's Exhibits 10, 11, and 12.

Williams had not objected to this portion of the State's opening statements at trial.  See Williams, SDO at 2 (citing Hawai'i Rules of Penal Procedure ("HRPP") Rule 52(b); State v. Sanchez, 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App. 1996)).[10]  The ICA stated "the burden [is] on the defendant to show bad faith on the part of the prosecutor, unless the fundamental rights of the defendant were substantially prejudiced."  Williams, SDO at 3 (quoting State v. Moore, 82 Hawai'i 202, 213, 921 P.2d 122, 133 (1996)) (alteration in original).  The ICA also cited to State v. Valdivia, 95 Hawai'i 465, 479, 24 P.3d 661, 675 (2001), stating that this court concluded that even if a prosecutor's comments were improper and made in bad faith, such misconduct was "harmless beyond a reasonable doubt because the circuit court instructed the jury no fewer than three times that counsels' statements and arguments were not evidence and not to be considered during deliberations; there was no evidence that the jury failed to adhere to those instructions."  Williams, SDO at 3-4.  Similarly, although the ICA agreed the State's comments were improper because the fact that minor son was taken out of Williams's custody is unrelated to any of the elements of the offense, as the family court had instructed the jury both before

---

[10]    As discussed infra, an objection was not required due to the in limine ruling precluding such references.

opening statements and when issuing general jury instructions that the attorneys' comments were not evidence, and as the record did not demonstrate the jury failed to adhere to these instructions, it concluded the prosecutor's improper comments were harmless beyond a reasonable doubt. See Williams, SDO at 4.

As to the second issue, the ICA did not address whether a proper foundation had been laid for the admission of State's Exhibits 3 and 4. Instead, the ICA ruled that even if the family court had erred in admitting the x-rays of minor son's femur bone into evidence, such error was harmless beyond a reasonable doubt. See Williams, SDO at 4. The ICA referred to the testimony by Dr. Doerrige, Dr. Polk, and the two nurses regarding the extent of minor son's injuries and the type of distress minor son had been in upon arriving at the hospital. See Williams, SDO at 4-5. The ICA also stated, "X-ray results are the type of data that doctors reasonably rely on in rendering a diagnosis and both doctors testified as to their observations that [minor son] suffered a fractured femur." Id.

As to the third issue, Williams had argued no evidence had been presented that he had caused bodily injury to minor son. The ICA noted, however, that Dr. Doerrige had testified that a broken femur is "notoriously painful" and "would cause most

children to cry, and would prevent a child from sleeping through the night, standing, or walking," yet Williams, minor son's sole caretaker, had not brought him to the hospital until approximately ten hours later. Williams, SDO at 5. The ICA also referred to the evidence that Williams had appeared aloof at the hospital despite minor son's severe distress and pain. Id. Furthermore, the ICA pointed out that both Dr. Doerrige and Dr. Polk testified that minor son's injuries were inconsistent with Williams's explanation of jumping or falling off a bed. Williams, SDO at 5-6. The ICA also noted Dr. Doerrige's testimony that children do not typically learn how to jump until over twenty-four months old, and minor son had just turned twenty-four months old. See Williams, SDO at 6. Viewing such evidence in the light most favorable to the State, the ICA concluded that "there is sufficient evidence that Williams at least recklessly caused [minor son] to suffer bodily injury." Id.

In his certiorari application, Williams essentially reasserts the same points of error:

> Whether the ICA gravely erred in holding that: (1) the prosecutor's improper comments constituted harmless error; (2) the [family] court did not err in admitting the x-rays into evidence without the improper [sic] foundation; and (3) there was sufficient evidence to sustain Williams's conviction.

### III.  Standards of Review

#### A.   Prosecutorial misconduct

> Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction. Factors considered are: (1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.

State v. Maluia, 107 Hawai‘i 20, 24, 108 P.3d 974, 978 (2005) (citation omitted).

#### B.   Admissibility of x-rays

> [D]ifferent standards of review must be applied to trial court decisions regarding the admissibility of evidence, depending on the requirements of the particular rule of evidence at issue.  When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard is applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

Kealoha v. Cty. of Hawai‘i, 74 Haw. 308, 319-20, 844 P.2d 670, 676 (1993).  In general, "[w]hether or not an x-ray photograph has been sufficiently verified so as to warrant its admission in evidence is a matter within the sound discretion of the trial judge and will be reviewed for an abuse of discretion."  State v. Torres, 60 Haw. 271, 276, 589 P.2d 83, 86 (1978).

#### C.   Plain error

"[T]his court will apply the plain error standard of review to correct errors which seriously affect the fairness,

integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights."  State v. Henley, 136 Hawai'i 471, 478, 363 P.3d 319, 326 (2015) (citations omitted).

### IV.  Discussion

**A.  The deputy prosecuting attorney's elicitation of evidence regarding Child Welfare Services violated Williams's right to a fair trial.**

Williams argues on certiorari that the deputy prosecuting attorney's comments in his opening statement that minor son was "transferred to another family and reunited with his mother" and that the jury would meet "Detective Melvin Raquedan, who assists with the transfer of custody," as well as "social worker Robert Asato, who aids in the transfer from Tripler [] after [minor son] is treated and released and how he is ultimately reunited down the road with his mother" was prosecutorial misconduct, requiring this court's further review.

"The term 'prosecutorial misconduct' is a legal term of art that refers to <u>any</u> improper action committed by a prosecutor, however harmless or unintentional."  Maluia, 107 Hawai'i at 25, 108 P.3d at 979.[11]  Williams asserts the ICA erred in ruling

---

[11]    We further stated in Maluia:

> [T]here are varying degrees of prosecutorial misconduct. . . . [M]ost cases . . . do not involve
>
> (continued. . .)

that, even if the deputy prosecuting attorney's comments were improper and made in bad faith, the misconduct was harmless beyond a reasonable doubt because the family court had repeatedly instructed the jury that the attorneys' statements and arguments were not evidence and not to be considered during

---

(. . .continued)

> prosecutors who intend to eviscerate the defendant's constitutional and statutory rights[.]
>
> . . . .
>
> Nevertheless, we decline to create a separate category of prosecutorial "mistake" or "error." There are three reasons why we believe that our current method of analysis -- in which all improper conduct is labeled "prosecutorial misconduct" -- is more appropriate.
>
> First, there is no need to create separate categories because this court already distinguishes innocuous prosecutorial misconduct from more serious deceitful behavior[.] . . . In sum, whenever a defendant alleges prosecutorial misconduct, this court must decide: (1) whether the conduct was improper; (2) if the conduct was improper, whether the misconduct was harmless beyond a reasonable doubt; and (3) if the misconduct was not harmless, whether the misconduct was so egregious as to bar reprosecution. In the course of making these three determinations, the seriousness of the misconduct becomes evident, and we need not attach a separate label for our disposition to be clear. Consequently, a separate label for "misconduct" cases and "error" cases is unnecessary.
>
> Second, a finding of "prosecutorial misconduct" is not equivalent to a finding of "professional misconduct" pursuant to the Hawai'i Rules of Professional Conduct (HRPC), and a prosecutor need not face disciplinary sanctions merely because we have used the term "prosecutorial misconduct." . . .
>
> Third, we believe that separate nomenclature for different types of prosecutorial misconduct would lead to protracted litigation over semantics; this would place an additional burden on our courts with no corresponding benefit.

107 Hawai'i at 25-26, 108 P.3d at 979-80.

deliberations, and that there was no evidence that the jury failed to adhere to those instructions. We agree with Williams that the ICA erred.

Whenever a defendant alleges prosecutorial misconduct, this court must consider three factors: "(1) whether the conduct was improper; (2) if the conduct was improper, whether the misconduct was harmless beyond a reasonable doubt; and (3) if the misconduct was not harmless, whether the misconduct was so egregious as to bar reprosecution." Maluia, 107 Hawai'i at 26, 108 P.3d at 980. Williams argues the deputy prosecuting attorney's opening statement comments were improper. He specifically only raises the issue of improper reference to Child Welfare Services in the context of the opening statement.

The deputy prosecuting attorney's opening statement comments were clearly improper, but we need not address whether the ICA erred in ruling them harmless based on the family court's instruction to not consider them as evidence. This is because the deputy prosecuting attorney improperly elicited evidence of the involvement of Child Welfare or Protective Services in minor son's case during the testimonies of Detective Raquedan, social worker Robert Asato, and Dr. Doerrige, notwithstanding the family court's order granting a defense motion in limine excluding any reference to an investigation and

24

case by Child Welfare Services and any legal issues stemming from that investigation and case.  On appeal and certiorari, Williams did not raise this elicitation of evidence as additional bases of misconduct.  When a defendant has not raised misconduct on appeal, we must determine whether the misconduct constituted plain error affecting the defendant's substantial rights.[12]

Granted, the State was required to prove Williams was the "parent or guardian or any other person having legal or physical custody" of [minor son] to establish the family court's jurisdiction over the case.[13]  It is unclear why the extensive testimony that Williams identified himself as minor son's father to the medical witnesses was insufficient to establish this requirement and if not, why additional evidence could not have been elicited from one or more of the medical witnesses.[14]  Especially when it chose to call Detective Raquedan and social worker Robert Asato, the State should have been careful not to

---

[12]    HRPP Rule 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed even if they were not brought to the attention of the court."

[13]    See supra notes 2 and 3.  See also HRS § 701-114(1)(c) (2014) (requiring proof beyond a reasonable doubt of facts establishing jurisdiction for a person to be convicted of an offense).

[14]    For example, nurses Santana and Blakey and Dr. Doerrige testified extensively regarding minor son and his father, Williams.

elicit evidence regarding the involvement of Child Welfare Services, which violated the motion in limine. In addition, it should not have asked Dr. Doerrige whether she had alerted authorities to elicit her response that "Child Protective Services" had been contacted.

Thus, because the elicited evidentiary references to the involvement of Child Welfare Services were improper under the first factor of the prosecutorial misconduct analysis, we next address whether the misconduct was harmless beyond a reasonable doubt under the second factor.

"Allegations of prosecutorial misconduct are [then] reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." State v. Pasene, 144 Hawai'i 339, 365, 439 P.3d 864, 890 (2019) (citations omitted). To address whether misconduct was harmless beyond a reasonable doubt, we consider three prongs: "the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." State v. Iuli, 101 Hawai'i 196, 208, 65 P.3d 143, 155 (2003) (citations omitted).

Addressing the first prong, the nature of the alleged misconduct, the evidence improperly adduced by the State that Dr. Doerrige called "Child Protective Services" and that Child Welfare Services had become involved in the case, which, at minimum, implied that Dr. Doerrige, a medical expert, suspected or found abuse, which was directly related to the central question of whether Williams had intentionally, knowingly, or recklessly caused minor son's injury, and was therefore extremely prejudicial to Williams.  As to the second prong, the promptness or lack of a curative instruction, there was no curative instruction.  With respect to the third prong, the strength or weakness of the evidence against Williams, we note the medical witnesses differed on the cause of minor son's injury and Dr. Happy testified on behalf of Williams that minor son's injuries were consistent with jumping and falling off of a bed.  Therefore, the evidence against Williams was not so overwhelmingly strong that there was not "a reasonable possibility that the error complained of might have contributed to" the conviction.  State v. Underwood, 142 Hawaiʻi 317, 328, 418 P.3d 658, 669 (2018) (citation omitted).  Thus, the prosecutor's improper elicitation of evidence affected Williams's substantial rights and was not harmless beyond a reasonable doubt.

Turning to the third factor of the prosecutorial misconduct analysis, however, we do not find the misconduct so egregious as to bar reprosecution. We therefore vacate the conviction, but remand the case to the family court for further proceedings consistent with this opinion.

**B.  There was insufficient foundation for the admission of State's Exhibits 3 and 4.**

On certiorari, without identifying the x-rays he objects to by exhibit number, Williams argues that certain x-rays should not have been admitted in evidence due to a lack of foundation. In his opening brief, Williams took issue with the admission of State's Exhibits 3, 4, 10, 11, and 12. The family court did not, however, actually admit State's Exhibits 10, 11, and 12, x-ray images of minor son's left leg taken at Wahiawa General Hospital, into evidence. Dr. Doerrige testified, without defense objection, that these were x-rays of minor son's left femur fracture taken at Wahiawa General Hospital and what they depicted was consistent with her diagnosis and examination of minor son. When they were offered into evidence, however, the family court sustained the defense's objection based on lack of foundation. The State then indicated it would offer them later subject to linkage, but they were never proffered again. Thus, we only address the admission of State's Exhibits 3 and 4.

28

On certiorari, Williams asserts the State failed to authenticate the x-rays as those of minor son.  Williams asserts the family court's error in admitting the x-rays cannot be considered harmless error because the admission of the x-rays depicting a broken and realigned femur substantially prejudiced him.  He also asserts the visual evidence of a broken bone was graphic and pulled at the emotions of the triers of fact and prejudiced his right to a fair and impartial jury under article I, section 14 of the Hawai'i Constitution and the Sixth Amendment to the United States Constitution.

The State appears to concede a lack of foundation, as it does not argue a proper foundation had been laid for the admission of State's Exhibits 3 and 4; it only argued that their admission was harmless beyond a reasonable doubt, as later concluded by the ICA, but we proceed to address whether there was sufficient foundation for the admission of State's Exhibits 3 and 4.

State's Exhibits 3 and 4 would have been admissible as a "record of regularly conducted activity" pursuant to HRE Rule 803(b)(6) if sufficient foundation was laid as to their authenticity by "the testimony of the custodian or other qualified witness, or by certification that complies with rule 902(11) or a statute permitted certification[.]"  There was no

29

certification, and Dr. Polk was not a "custodian" of records of Tripler.  The issue therefore is whether Dr. Polk could be deemed an "other qualified witness" for purposes of laying a foundation for admission of the x-rays from Tripler.

In State v. Fitzwater, 122 Hawai'i 354, 227 P.3d 520 (2010), this court stated:

> A person can be a "qualified witness" who can authenticate a document as a record of regularly conducted activity under HRE Rule 803(b)(6) or its federal counterpart even if he or she is not an employee of the business that created the document, or has no direct, personal knowledge of how the document was created. As one leading commentator has noted:
>
>> ... The phrase "other qualified witness" is given a very broad interpretation. The witness need only have enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business. The witness need not have personal knowledge of the actual creation of the documents or have personally assembled the records. In fact, the witness need not even be an employee of the record-keeping entity as long as the witness understands the entity's record-keeping system.
>>
>> There is no requirement that the records have been prepared by the entity that has custody of them, as long as they were created in the regular course of some entity's business.
>>
>> The sufficiency of the foundation evidence depends in part on the nature of the documents at issue. Documents that are "standard records of the type regularly maintained by firms in a particular industry may require less by way of foundation testimony than less conventional documents proffered for admission as business records."
>
> 5 Joseph McLaughlin, Weinstein's Federal Evidence § 803.08[8][a] (2d ed. 2009) (footnotes omitted).

122 Hawai‘i at 366, 227 P.3d at 532 (footnote omitted) (ellipsis in original).

Dr. Polk had apparently worked for Tripler as a resident for four years in the late 1970s, but there was no foundation laid sufficient to render him an "other qualified witness" as to Tripler's x-rays. In addition, the ICA's statement that "[x]-ray results are the type of data that doctors reasonably rely on in rendering a diagnosis and both doctors testified as to their observations that [minor son] suffered a fractured femur" as a basis for its conclusion that the admission of the x-rays was harmless does not go to the issue of whether sufficient foundation had been laid for their admission, but only as to a basis for expert testimony pursuant to HRE Rule 703 (1984).[15]

Thus, insufficient foundation was laid for the admission of State's Exhibits 3 and 4. Because we vacate the conviction on other grounds, we need not address whether the admission of these x-rays was harmless.

---

[15]    HRE Rule 703 provides in relevant part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

## C.   Williams's conviction was supported by substantial evidence.

Because the defense raised the issue of sufficiency and we have decided the prosecutorial misconduct was not of the nature that precludes reprosecution, we must address the third issue on certiorari.  Namely, we address whether there was sufficient evidence despite trial error to support the conviction on the charge of assault in the third degree.  See State v. Davis, 133 Hawai'i 102, 120, 324 P.3d 912, 930 (2014) ("[A] reviewing court is required under article I, section 10 of the Hawai'i Constitution to address a defendant's express claim of insufficiency of the evidence prior to remanding for a new trial . . . .").

An appellate court reviews the sufficiency of evidence on appeal as follows:

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury.  The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (alteration in original) (citation omitted).  "'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a

conclusion." <u>Id.</u> (internal quotation marks and citation omitted).

For the reasons explained by the ICA in Section II.C above, the conviction of assault in the third degree was supported by substantial evidence. Therefore, the third issue on certiorari lacks merit.

## V.   Conclusion

For the reasons explained above, we vacate the family court's March 28, 2017 final judgment, as well as the ICA's September 25, 2018 judgment on appeal, and remand this case to the family court for further proceedings consistent with this opinion.

Lesley N. Maloian,
for petitioner

Stephen K. Tsushima,
for respondent

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

