**NOT FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

NOS. CAAP-19-0000591 and CAAP-19-0000592

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

**CAAP-19-0000591**
IN THE INTEREST OF LC1
(FC-S NO. 18-00140)

AND

**CAAP-19-0000592**
IN THE INTEREST OF LC2
(FC-S NO. 19-00132)

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT

SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Leonard and Hiraoka, JJ.)

Mother-Appellant (**Mother**) appeals from, *inter alia*, the August 6, 2019 Orders Concerning Child Protective Act (**Custody Orders**), issued by the Family Court of the First Circuit (**Family Court**).[1] Mother also challenges various of the Family Court's September 20, 2019 Findings of Fact and Conclusions of Law (**FOFs and COLs**).

---

[1] The Honorable Bode A. Uale presided.

In the Custody Orders, the Family Court revoked Petitioner-Appellee Department of Human Services' (**DHS**) family supervision of Mother and her child, LC1, confirmed DHS's custody of LC1, and granted DHS's Petition for Temporary Custody of Mother's child, LC2 (collectively, the **Children**).

On appeal, Mother contends that the Family Court erred in COL 7 when it concluded that she was not willing and able to provide a safe family home, even with the assistance of a service plan. Mother principally argues the Family Court reversibly erred when it admitted into evidence State's Exhibit 6, Queen's Medical Center records that include toxicology results for Mother and LC2 (**Toxicology Report**), or otherwise relied on the Toxicology Report, without a sufficient foundation and without it being properly admitted into evidence. She further argues that, without the exhibit, there was insufficient evidence to show that she and LC2 tested positive for methamphetamine and amphetamine. Relatedly, Mother challenges and/or otherwise contends that FOFs 34, 38, 46, 47, 50, 51, 70, 78, 79, 81-87, 89-94 are clearly erroneous. In addition, Mother submits that she did not receive a fair trial because the Family Court based its decision in part on the court's feeling that Mother had "duped" the court in prior proceedings with respect to her alleged drug use. Finally, Mother contends that the Family Court applied the wrong standard to her motion for reconsideration and reversibly erred in denying that motion.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to

the arguments advanced and the issues raised by the parties, we resolve Mother's points of error as follows:

Mother argues that the Family Court reversibly erred by considering, without a sufficient foundation or proper admission into evidence, the Toxicology Report, which purportedly shows that on May 21, 2019, Mother tested positive for methamphetamine and amphetamine when she was admitted to Queen's Medical Center (**Queen's**) for LC2's birth, and on May 22, 2019, when LC2 was born, that Mother and LC2 tested positive for methamphetamine and amphetamine.

An evidentiary hearing was held on July 31, 2019. Although the Family Court denied a motion to strike the Toxicology Report, it is unclear whether the Toxicology Report was admitted into evidence at the July 31, 2019 hearing. DHS witnesses included Sherrilyn Watai (**Nurse Watai**), a registered nurse at Queen's, where LC2 was born. Nurse Watai testified, *inter alia*, that she collected a specimen from LC2 of meconium, which is a baby's first stool, and sent the specimen to the hospital's lab. She stated that she believed that the specimen was sent out to Diagnostic Laboratory Services (**DLS**) for testing, and that testing is not run within the Queen's system. Nurse Watai did not testify as to the contents of the Toxicology Report or lay any further foundation for the admission of the report.

DHS also called Dr. Clifford Wong (**Dr. Wong**), who was employed as the director of the toxicology department at Clinical Laboratories of Hawaii (**Clinical Labs**). Dr. Wong testified regarding Clinical Labs' drug testing of hair samples. On cross-

examination of Dr. Wong, a Clinical Labs report showing negative drug test results for Mother's hair sample was admitted into evidence. When asked on direct examination about meconium drug testing, he stated that Clinical Labs does not do such testing in-house, but he was familiar with the testing; he answered various questions about the nature and significance of meconium drug testing. Dr. Wong was shown what appears to have been the Toxicology Report, and he stated that he did not know Queen's procedures for processing meconium, but that the report he was shown stated that a specimen was sent to a testing laboratory in Illinois, United States Drug Testing Labs. The report shown to Dr. Wong was not admitted into evidence through his testimony, and no attempt was made to elicit foundational testimony from Dr. Wong.

DHS called Lisa Kunioka (**Ms. Kunioka**), an assessment worker in DHS's Child Welfare Services, whom the court qualified as an expert in child welfare services. Ms. Kunioka testified that her supervisor told her to remove LC2 from Mother's custody. She said that she then called Queen's and spoke to someone on the telephone, whom she believed was the charge nurse, as well as a hospital social worker, to confirm that Mother and LC2 tested positive for methamphetamine. Mother objected to the testimony on the grounds that DHS was attempting to use an expert to allow hearsay testimony as to the contents of a report with no underlying indicia of reliability and that the contents were based on statements from other people. It was further argued that her opinion as to harm should not be allowed if she did not

have any underlying facts on which to base her opinion. All objections were overruled. Although Ms. Kunioka was shown the Toxicology Report at the hearing, she did not testify that she relied on the report, and the report was not admitted into evidence through her testimony.

DHS also called Lena Kakehi (**Ms. Kakehi**), a DHS child and adult protective services specialist. The court qualified Ms. Kakehi as an expert in child welfare services, noting in part that she was the current case manager in this case. She testified that she was informed by Ms. Kunioka of the positive drug tests. She offered no testimony regarding the Toxicology Report.

After testimony was concluded, Mother asked the court to strike the Toxicology Report because the State did not present its witness who was slated to authenticate the document and provide information about the drug testing reflected in the report. At the conclusion of arguments, the court orally ruled that it was not striking the Toxicology Report because "it was appropriately testified to by [N]urse Watai and, also, Dr. Clifford Wong made comments about the testing." The court then stated: "You know, I just feel like I was duped by your client, Mr. Haia, when I returned the child to her, honestly feeling like, you know, she was no longer using." It is clear from the court's further remarks, as well as the written FOFs and COLs that the court was ruling against Mother based on the positive drug test contained in the Toxicology Report.

Mother argues that the Toxicology Report should not have been admitted in evidence due to a lack of foundation. The State argues that Nurse Watai's credible testimony that she took LC2's meconium, and Dr. Wong's credible testimony regarding the significance of a positive meconium test, provided sufficient foundation for the Toxicology Report to be admitted into evidence or otherwise relied on by the Family Court. The State's argument is without merit.

In State v. Williams, 146 Hawaiʻi 62, 74-75, 456 P.3d 135, 147-48 (2020), the Hawaiʻi Supreme Court recently considered whether a family court abused its discretion in admitting certain x-rays into evidence due to a lack of foundation. The supreme court addressed the sufficiency of the foundation for the admission of these particular x-rays as follows:

> State's Exhibits 3 and 4 would have been admissible as a "record of regularly conducted activity" pursuant to [Hawaii Rules of Evidence (**HRE**)] Rule 803(b)(6) if sufficient foundation was laid as to their authenticity by "the testimony of the custodian or other qualified witness, or by certification that complies with rule 902(11) or a statute permitted certification[.]" There was no certification, and Dr. Polk was not a "custodian" of records of Tripler. The issue therefore is whether Dr. Polk could be deemed an "other qualified witness" for purposes of laying a foundation for admission of the x-rays from Tripler.
>
> In State v. Fitzwater, 122 Hawaiʻi 354, 227 P.3d 520 (2010), this court stated:
>
>> A person can be a "qualified witness" who can authenticate a document as a record of regularly conducted activity under HRE Rule 803(b)(6) or its federal counterpart even if he or she is not an employee of the business that created the document, or has no direct, personal knowledge of how the document was created. As one leading commentator has noted:
>>
>>> . . . The phrase "other qualified witness" is given a very broad interpretation. The witness need only have enough familiarity with the record-keeping system of the business in question to explain how the record came into existence in the ordinary course of business. The witness need not have personal knowledge of

6

> the actual creation of the documents or have personally assembled the records. In fact, the witness need not even be an employee of the record-keeping entity as long as the witness understands the entity's record-keeping system.
>
> There is no requirement that the records have been prepared by the entity that has custody of them, as long as they were created in the regular course of some entity's business.
>
> The sufficiency of the foundation evidence depends in part on the nature of the documents at issue. Documents that are "standard records of the type regularly maintained by firms in a particular industry may require less by way of foundation testimony than less conventional documents proffered for admission as business records."

> 5 Joseph McLaughlin, <u>Weinstein's Federal Evidence</u> § 803.08[8][a] (2d ed. 2009) (footnotes omitted).

122 Hawaiʻi at 366, 227 P.3d at 532 (footnote omitted) (ellipsis in original).

> Dr. Polk had apparently worked for Tripler as a resident for four years in the late 1970s, but there was no foundation laid sufficient to render him an "other qualified witness" as to Tripler's x-rays. In addition, the ICA's statement that "[x]-ray results are the type of data that doctors reasonably rely on in rendering a diagnosis and both doctors testified as to their observations that [minor son] suffered a fractured femur" as a basis for its conclusion that the admission of the x-rays was harmless does not go to the issue of whether sufficient foundation had been laid for their admission, but only as to a basis for expert testimony pursuant to HRE Rule 703 (1984).
>
> Thus, insufficient foundation was laid for the admission of State's Exhibits 3 and 4.

<u>Id.</u> (footnote omitted).

In this case, there was no certification. Dr. Wong was not a custodian of the records of Queen's (and he did not otherwise work for Queen's), he specifically testified that he did not know Queen's procedures related to meconium testing, and there was no foundation laid sufficient to render him an "other qualified witness" as to Queen's record-keeping system and/or that of a third-party testing laboratory used by Queen's. Nurse Watai was employed by Queen's and testified as to the collection of the meconium specimen and the transmission of the specimen to

Queen's lab. However, she had no specific knowledge of what happened to the specimen after that, mistakenly believing that it was sent to DLS, and she was not offered as a custodian of records for Queen's or as someone with familiarity with the Queen's record-keeping system to explain how the Toxicology Report from United States Drug Testing Labs was created and incorporated into Queen's records. The person that was apparently intended to be offered as a witness for that purpose, APRN-RX Justine Tye, was not called as a witness by the State.

Thus, insufficient foundation was laid for the admission of the Toxicology Report and the Family Court abused its discretion in admitting it into evidence and/or otherwise considering it. The Family Court made findings regarding Mother's and LC2's positive drug tests based on the Toxicology Report, and made further findings that, based on those positive drug tests, it was more likely than not that Mother used and exposed LC2 to drugs *in utero*. Those findings were central to the Family Court's findings that Mother has an unresolved substance abuse problem and its conclusion that Mother was not presently willing and able to provide the Children with a safe family home, even with the assistance of a service plan. On the record in this case, we cannot conclude that the Family Court's error in admitting and/or otherwise considering the Toxicology Report was harmless.

Therefore, we conclude that the Custody Orders must be vacated on these grounds. Accordingly, we need not address Mother's other arguments on appeal.

For the reasons stated above, the Family Court's August 6, 2019 Custody Orders are vacated, and this case is remanded to the Family Court for further proceedings pursuant to HRS Chapter 587A concerning the safety and health of the Children.

DATED: Honolulu, Hawaiʻi, July 28, 2020.

On the briefs:

Thomas A.K. Haia,
for Mother-Appellant.

Gay M. Tanaka,
Julio C. Herrera,
Erin Torres,
Deputy Attorneys General,
for Petitioner-Appellee
 Department of Human Services.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Keith K. Hiraoka
Associate Judge